## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

CHARLES KALEB VANLANDINGHAM,
Administrator for the Estate of Charles
Lamar Vanlandingham

        Plaintiff,

vs.

(1) THE CITY OF OKLAHOMA CITY,
a municipal corporation;
(2) AMERICAN MEDICAL RESPONSE
AMBULANCE SERVICE, INC., a foreign
corporation;
(3) OFFICER BRANDON LEE, an
employee of the Oklahoma City Police
Department, individually;

        Defendants.

Case No. 5:22-cv-00209-D

## DEFENDANT AMERICAN MEDICAL RESPONSE AMBULANCE SERVICE, INC.'S MOTION TO EXCLUDE OR LIMIT TESTIMONY OF PLAINTIFF'S EXPERT JOHN B. EVERLOVE AND BRIEF IN SUPPORT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ i

I.      Introduction ............................................................................................ 1

II.     The Rule 702 Framework ......................................................................... 4

III.    Brief Summary of John B. Everlove, EMT-Paramedic, MS, NRP's Opinions ...... 7

IV.     Mr. Everlove did not Apply a Reliable Methodology to the Facts and Issues of the Case by  Failing to Formulate Opinions about the OKCFD Emergency Medical Providers ................................................................................................ 7

V.      Mr. Everlove Refused to Answer Critical Questions that Establish his Testimony as Unreliable ............................................................................................ 11

VI.     Mr. Everlove's Testimony Should be Limited Based on his Training and Experience ............................................................................................ 14

        A. Mr. Everlove Should not be Allowed to Testify Regarding Mr. Vanlandingham's Diagnosis or Cause of Death ............................................. 14

        B. Mr. Everlove Should be Precluded from Opining on the Impact Versed had on Mr. Vanlandingham's Death .............................................................. 16

WHEREFORE ............................................................................................... 16

# TABLE OF AUTHORITIES

## CASES:

*Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232-33, 1234 (10th Cir. 2004) .........................6

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592, 593-594, 597,
    113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)................................................. 1, 5, 6

*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221, 1222, 1223 (10th Cir. 2003) ................ 5, 6, 7

*Goebel v. Denver & Rio Grande W. Ry.*, 215 F.3d 1083, 1087, 1088 (10th Cir. 2000).......7

*Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082, 1092-93 (W.D. Okla. 2009)........ 14

*Ho v. Michelin N. Am., Inc.*, 520 Fed. Appx. 658, 662 (10th Cir. 2013)................................6

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149, 119 S. Ct. 1167,
    143 L. Ed. 2d 238 (1999)................................................................................5, 6

*Lippe v. Howard,* 287 F. Supp. 3d 1271, 1279 (W.D. Okla. 2018) ...................... 14

*Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 969, 970 n.4.
    (10th` Cir. 2001)....................................................................................................5, 6

*U.S. v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc)............................................5

*U.S. v. Sparks*, 8 Fed. Appx. 906, 912 (10th Cir. 2001). ...............................................................7

*United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009)...................................................6

## STATUTES AND OTHER AUTHORITIES:

FRE 104(a) ...........................................................................................................7
FRE 401 ...............................................................................................................2
FRE 402 ...............................................................................................................2
FRE 403 ...............................................................................................................2
FRE 702.............................................................................2, 5, 7, 8, 9, 11, 13
2023 Amendments to FRE 702 ...................................................................7
FRE 702 (2023 Adv. Cmt.) ...........................................................................7
FRE 702(a-b) ..............................................................................................10, 13
FRE 702(c-d) ..............................................................................................10, 13
FRE 702(d) ....................................................................................................11

**DEFENDANT AMERICAN MEDICAL RESPONSE AMBULANCE
SERVICE, INC.'S MOTION TO EXCLUDE OR LIMIT TESTIMONY
OF PLAINTIFF'S EXPERT JOHN B. EVERLOVE AND BRIEF IN SUPPORT**

Defendant American Medical Response Ambulance Service, Inc. ("AMRAS") respectfully moves this Court enter an order excluding or limiting the testimony of Plaintiff's expert John B. Everlove, EMT-Paramedic, MS, NRP, as inadmissible under Federal Rules of Evidence 401, 402, 403, and 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

## I.     Introduction.

This action arises from a request for the emergency transport of Charles Lamar Vanlandingham who was reported, through a 911 call, to be having seizure-like symptoms. AMRAS personnel William Tuttle, EMT-Paramedic and Skylar Barnes, EMT-Basic, first responded to the scene. The events that evolved were fluid and rapidly changing. After conducting a preliminary survey and a blood glucose level check for Mr. Vanlandingham, Mr. Vanlandingham became violent, grabbed and pushed Paramedic Tuttle repeatedly, and attempted to bite Paramedic Tuttle several times.  Paramedic Tuttle was eventually able to contain Mr. Vanlandingham against the gurney until an Oklahoma City Fire Department crew ("OKCFD") arrived to takeover and assist.

The following provides a timeline that sets out those events:

| 03:54:04 | 911 Call | AMRAS 00003, Ex. 1 |
|---|---|---|
| 03:54:36 | EMSA dispatched | AMRAS 00003, Ex. 1 |
| 03:54:43 | EMSA En Route | AMRAS 00003, Ex. 1 |
| 04:03:50 | At scene | AMRAS 00003, Ex. 1 |
| 04:05:00 | At Patient | AMRAS 00003, Ex. 1 |
| 04:05:36 | LifePak powered on | EMSA 00051, Ex. 2 |
| 04:07:51 | EMSA request for lift assistance | EMSA 00002, Ex. 3 |

| 04:07:55 | Change to EM Medical as reason for assistance | EMSA 00002, Ex. 3 |
|---|---|---|
| 04:08:03 | OKCFD dispatched | OKC 015299, Ex. 4 |
| 04:08:58 | OKCFD En Route | OKC 015299, Ex. 4 |
| 04:10:45 | EMSA requests PD emergent / not safe | OKC 001738, Ex. 5 |
| 04:11:44 | Officer Lee (3A48) assigned | OKC 001737, Ex. 5 |
| 04:15:30 | OKCFD arrived | OKC 015299, Ex. 4 |
| 04:15:45 | OKFD at Patient | OKC 015299, Ex. 4 |
| 04:18:48 | Officer Lee (3A48) arrived | OKC 001737, Ex. 5 |
| 04:20:19 | Officer Lee reports handcuffs used | OKC 001738, Ex. 5 |
| 04:20:51 | AMRAS 2nd Crew arrived – Chris Giles, EMT-Paramedic and Miranda Karagavoorian Schudalla, EMT-Basic (2nd crew arrived after handcuffs applied and immediately after Versed administered) | EMSA 00003, Ex. 3 |
| 04:21:51 | LifePak attempts read | AMRAS 00002, Ex. 1/ EMSA 00008, Ex. 6 |
| | Chest compressions being administered prior to pad placement to check heart rate/rhythm | OKC 001730, Ex. 7 |
| 04:24:59 | CPR recording started | EMSA 00102, Ex. 2 |
| 04:25:00 | AMRAS Supervisor Cody Chaney arrived | AMRAS 0009-25, Ex. 8 |
| 05:01:00 | CPR terminated/Mr. Vanlandingham's death pronounced | EMSA 0012, Ex. 9 |

This timeline reveals that, from the time Paramedic Tuttle and EMT-Basic Barnes arrived on the scene until the second AMRAS crew arrived and Mr. Vanlandingham went into cardiac arrest, only fifteen minutes had passed. The OKCFD crew, which included Corporal/Paramedic Sean Morton, Major/EMT-Basic Trevor Lewis, Firefighter/EMT-Basic Zachary Osten, and Lieutenant/EMT-Basic Kevin Rolke, was dispatched and arrived ten minutes after AMRAS initially engaged with Mr. Vanlandingham. *See* Ex. 4. The OKCFD crew relieved the AMRAS team as Mr. Tuttle was completely exhausted from the physicality of his interactions with Mr. Vanlandingham. *See* OKC Audio Interview (Paramedic Morton) 5-B-15, Ex. 10. OKCFD Major/EMT-Basic Lewis described the situation as follows:

> I was very concerned about the medic [Tuttle] at that time because he looked very worn out. He was sweating profusely and it appeared that he didn't have anything left. I continued my concern after with him, because he was coughing a lot after the incident . . . and he looked completely worn out. When I took charge of the patient, I grabbed him and pulled him away from the cot and put him on the ground so he wouldn't thrash around and hurt himself because he was fighting very hard.

*See* OKC Audio Interview (Major/EMT Lewis) at timestamp 4:30, Ex. 11. After this transfer of care, OKCFD Corporal/Paramedic Morton positioned himself by Mr. Vanlandingham's head and visually monitored his breathing. *See* Ex. 10, timestamp 9:05 and 9:47. Shortly thereafter, OKCFD Major/EMT-Basic Lewis requested Officer Lee to apply handcuffs to Mr. Vanlandingham for scene and patient safety purposes. *See* Ex. 11, at timestamp 7:43. OKCFD Corporal/Paramedic Morton then requested Versed to reduce Mr. Vanlandingham's agitation and aggression. *See* Ex. 10, at timestamp 7:22; Ex. 11, timestamp at 8:20. Paramedic Tuttle then exited the residence to collect the Versed from his ambulance. *See* Ex. 4 (OKC 015305). OKCFD Corporal/Paramedic Morton eventually transferred the care of the patient to AMRAS second arriving Paramedic, Chris Giles. *See* Ex. 7 (OKC 001730)

Oklahoma City Police Officer Lee arrived three minutes later. Handcuffs were applied immediately after his arrival and Versed was administered at the request of Oklahoma City Fire Department's Paramedic. *See* Ex. 7. Mr. Vanlandingham was observed to quickly deteriorate, and CPR was initiated. CPR was performed for more than 30 minutes and then was stopped after consultation with Medical Control.

## II.     The Rule 702 Framework.

To gauge the admissibility of expert testimony, courts employ the analytical framework set forth in *Daubert*. *Daubert*'s guiding principles have been incorporated into Rule 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert's opinion reflects reliable application of the principles and methods to the facts of the case.

FRE 702. As stated in the rule, the burden of demonstrating the admissibility of expert testimony, tested against the standards of *Daubert* and Rule 702, is on the proponent of the testimony. *See also U.S. v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc). As a precondition to admissibility, Rule 702 requires the trial court to assess the reasoning and methodology underlying the expert's opinion and testimony and determine whether they are both valid and applicable to a "particular set of facts." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) (citing *Daubert*, 509 U.S. at 592); *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003).

In deciding the admissibility of expert testimony, the court must determine whether the expert is proposing to testify to scientific or other specialized knowledge which will assist the trier of fact in understanding or determining a fact in issue. *Daubert*, 509 U.S. at 592. The court first determines whether the proposed expert is qualified to offer an opinion on the issues involved in the particular case. *Ralston v. Smith & Nephew Richards, Inc.,*

275 F.3d 965, 969 (10th Cir. 2001). A qualified expert must have the necessary knowledge, skill, experience, training or education relevant to the facts at issue. *Id.*

The court then must conduct a two-part inquiry to fulfill its *Daubert* gatekeeping role, determining first if the expert's proffered testimony has "'a reliable basis in the knowledge and experience of his [or her] discipline.'" *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232-33 (10th Cir. 2004) (quoting *Daubert*, 509 U.S. at 592). In making this determination, the court must decide whether the reasoning or methodology underlying the testimony is scientifically valid. *Id.* at 1233. Second, the district court must inquire "into whether proposed testimony is sufficiently 'relevant to the task at hand.'" *Id.* at 1234 (quoting *Daubert*, 509 U.S. at 597).

The Supreme Court has identified four non-exhaustive factors as useful in conducting the reliability analysis:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

*Ho v. Michelin N. Am., Inc.*, 520 Fed. Appx. 658, 662 (10th Cir. 2013) (quoting *Dodge*, 328 F.3d at 1222; *Daubert*, 509 U.S. at 593-94)). These factors may inform the analysis, but "do not constitute a definitive checklist or test." *Ho*, 520 Fed. Appx. at 662 (citing *United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009) (quotations omitted)); *Kumho Tire*, 526 U.S. 137.

The burden is on the proponent of the evidence to establish its admissibility. *Ralston*, 275 F.3d at 970 n.4. An expert may base his opinion on information made known

to him and, if of a type reasonably relied upon by other experts in his field, on evidence that would not otherwise be admissible. *U.S. v. Sparks*, 8 Fed. Appx. 906, 912 (10th Cir. 2001).

The court has discretion in how it conducts its gatekeeper function. *Dodge*, 328 F.3d at 1223. However, the Court must create "a sufficiently developed record in order to allow a determination of whether the district court properly applied the relevant law." *Id.* (quoting *Goebel v. Denver & Rio Grande W. Ry.*, 215 F.3d 1083, 1087 (10th Cir. 2000). When faced with an objection to expert testimony, the court "must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." *Goebel,* 215 F.3d. at 1088. The importance of this gatekeeping function informed the 2023 Amendments to FRE 702:

> But many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a). . . . The Committee concluded that emphasizing the preponderance standard in Rule 702 specifically was made necessary by the courts that have failed to apply correctly the reliability requirements of that rule. . . . Judicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond that the expert's basis and methodology may reliably support.

FRE 702 (2023 Adv. Cmt.). Mr. Everlove's opinions in this case are subject to exclusion under the Court's exercise of its gatekeeping role.

## III.    Brief Summary Of John B. Everlove, EMT-Paramedic, MS, NRP's Opinions.

Plaintiff has retained John Everlove, EMT-Paramedic, MS, NRP as an emergency medical services expert in the case. Mr. Everlove prepared an Expert Report ("Report").

That Expert Report includes the following opinion areas related to the emergency medical care of AMRAS:

- AMRAS personnel deviated in the standard of care for scene size-up;
- AMRAS personnel deviated in the standard of care for patient assessment; and,
- AMRAS personnel deviated in the standard of care for patient restraint and treatment.

*See* Everlove Report, Ex. 12.

**IV.    Mr. Everlove did not Apply a Reliable Methodology to the Facts and Issues of the Case by  Failing to Formulate Opinions about the OKCFD Emergency Medical Providers.**

During his deposition, Mr. Everlove indicated he was providing "opinions" in the case regarding the AMRAS crew's actions, but he simply had "observations" as to the other emergency medical providers involved in the event – the OKCFD emergency medical providers who significantly participated in the medical care of Mr. Vanlandingham.

```
          Do you have opinions in this case
involving the EMS care provided by the paramedic and
the EMTs for the Oklahoma City Fire Department?
     A    I have observations, not opinions.  And
what I mean by that is that I have not done a review
and analysis of the actions of the fire department
personnel on scene of the subject event in the way
that I was asked to review the EMS care provided by
the other providers.
```

*See* Everlove Depo., 24:9-17, Ex. 13.

Rule 702, provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and
**(d)** the expert's opinion reflects reliable application of the principles and methods to the facts of the case.

FRE 702. Mr. Everlove's testimony here does not meet any of those criteria. In Plaintiff's Third Amended Complaint, Plaintiff not only named the involved OKCFD first responders individually, before they were ultimately individually dismissed for reasons of qualified immunity, but in Plaintiff's Sixth Cause of Action, Plaintiff brings a "negligence" claim for "the above referenced firefighters and police officer" against the City of Oklahoma City. *See* Third Amended Complaint, Doc. 45. The actions of the OKCFD emergency medical crew are therefore a key part of the emergency medical services claims in the case raised directly by Plaintiff. However, while the jury is being charged to listen to and evaluate the actions of both the AMRAS and OKCFD crews for emergency medical services negligence, Mr. Everlove has selectively decided to ONLY render opinions as to AMRAS. Mr. Everlove's analysis is therefore directly at odds with the task before the jury.

Mr. Everlove rendered a 31-page expert report and has been presented for deposition without ever developing any opinions about the emergency medical care provided by the OKCFD. By contrast, AMRAS' paramedic expert, Jim Morrissey, EMT-Paramedic, MA, did evaluate the care provided by the OKCFD crew in his expert report.

- After the OKC Fire department Paramedic relieved Paramedic Tuttle and assumed the lead role in caring for Mr. Vanlandingham, the efforts were focused on trying to calm the patient and prevent injuries to everyone in the room, including the patient. The medical assessment and care provided by the fire department was appropriate and at no point did Paramedic Tuttle feel the need to re-establish leadership in the patient care process. Patient care was subsequently transferred to Paramedic Giles by Fire Medic Morton.

8

*See* Morrissey Expert Report, p. 7, Ex. 14. Mr. Everlove cannot assist the trier of fact with a grossly incomplete review and analysis of the actual emergency medical services negligence claims made by Plaintiff in the case. FRE 702(a-b).

Instead of applying reliable expert observation and scrutiny to all of the "facts of the case," Mr. Everlove has selectively excluded developing opinions as to the emergency medical services provided by the OKCFD Paramedic and EMT-Basics. In consciously and intentionally doing so, Mr. Everlove violated the tenants of FRE 702(c-d). Mr. Everlove cannot conduct a "reliable application of the principles and methods to the facts of the case" while purposefully avoiding that process as it relates to the emergency medical care provided by Defendant City of Oklahoma City. The City of Oklahoma City has literally been sued by Plaintiff for emergency medical provider negligence in this case, yet Plaintiff's emergency medical provider expert simply forgoes any analysis thereof.

The actions and efforts of the OKCFD crew towards Mr. Vanlandingham comprise a substantial part of the emergency medical care provided. The OKCFD crew included Corporal/Paramedic Sean Morton, Major/EMT-Basic Trevor Lewis, Firefighter/EMT-Basic Zachary Osten, and Lieutenant/EMT-Basic Kevin Rolke. *See* Ex. 4. The OKCFD crew accepted the transfer of care from the AMRAS team as Mr. Tuttle was completely exhausted from the physicality of his interactions with Mr. Vanlandingham. *See* OKC Ex. 10, at timestamp 4:30; Ex. 11, at timestamp 12:45. OKCFD's emergent care efforts for Mr. Vanlandingham included the following:

- OKCFD Corporal/Paramedic Morton positioned himself by Mr. Vanlandingham's head and visually monitored his breathing. *See* Ex. 10, at timestamp 9:05; 9:47.

9

- OKCFD Major/EMT-Basic Lewis requested Officer Lee to apply handcuffs to Mr. Vanlandingham for scene and patient safety reasons. *See* Ex. 11, at timestamp 7:43.

- OKCFD Corporal/Paramedic Morton ordered Versed be given to reduce Mr. Vanlandingham's agitation and aggression. *See* Ex. 10, at timestamp 7:22; Ex. 11, at timestamp 8:20.

- OKCFD Corporal/Paramedic Morton then eventually transferred the lead of care of the patient to AMRAS second arriving Paramedic, Chris Giles. *See* Ex. 7 (OKC 001730).

- OKCFD Corporal/Paramedic Morton and other members of the OKCFD crew were active in assisting in CPR (performing compressions, maintaining airway including using bag valve mask and performing intubation). *See* Ex. 10, at timestamp 11:10.

With so many important interventions being handled by the OKCFD crew, Mr. Everlove's opinions and testimony are grossly incomplete as he has declined to address whether any of the OKCFD's care actions constitute a deviation of the standard of care for the emergency medical services negligence claim that was again brought by Plaintiff.

Rather than "help the trier of fact," the incomplete assessment and testimony of Mr. Everlove is going to cause only abject confusion. In a negligence case such as this where multiple defendants have been accused of negligence, the jury will be charged with considering the respective negligence percentages of the various parties. By failing to develop any opinions whatsoever relating to the emergency medical care of Defendant City of Oklahoma City before the jury in this case, Mr. Everlove can only offer an incomplete and unreliable assessment that is properly subject to exclusion.

Mr. Everlove is tasked by Rule 702 to conduct a "reliable application of the principles and methods to the facts of the case." FRE 702(d). How can Mr. Everlove assist

the trier of fact in understanding or determining facts in issue when he admittedly failed to review and analyze the actions of one of the two emergency medical providers crews on scene that were sued for negligence in this case?

> "I have observations, not opinions. And what I mean by that is that I have not done a review and analysis of the actions of the fire department personnel on scene of the subject event in the way that I was asked to review the EMS care provided by the other providers."

*See* Ex. 13, 24:9-17. Assessing the EMS care of one EMS crew and not the other demonstrates the opposite of reliable methodology and is of no assistance to the jury.

## V. Mr. Everlove Refused to Answer Critical Questions that Establish his Testimony as Unreliable.

Mr. Everlove was asked repeatedly, for more than 35 pages of his deposition, whether he believed Mr. Vanlandingham was suffering from a life-threatening condition at initial presentation by the AMRAS crew. Mr. Everlove refused to answer for more than 35 pages. Mr. Everlove was provided three "open" options on this topic: (1) that Mr. Vanlandingham was suffering from a life-threatening condition at initial presentation; (2) that Mr. Vanlandingham was not suffering from a life-threatening condition at initial presentation; or (3) that there was insufficient information to form an opinion as to whether there was or was not a life-threatening condition upon initial presentation. *See* Ex. 13, 121:2-129:5 (the entirety of the exchange can be found on pp. 101-137). Mr. Everlove never committed to any of these answers despite being given the opportunity, repeatedly, to do so.

In his report and deposition, Mr. Everlove rendered opinions on the EMS care provided by AMRAS complaining that:

- AMRAS personnel deviated in the standard of care for scene size-up;
- AMRAS personnel deviated in the standard of care for patient assessment; and
- AMRAS personnel deviated in the standard of care for patient restraint and treatment.

*See* Everlove Report, Ex. 12. It is of course critical to the actions of an EMS professional whether a patient is in a life-threatening condition or not being in a life-threatening condition. This determination can affect which emergency medical care pathway the patient is to be placed.

Mr. Everlove's opinions criticizing Paramedic Tuttle and EMT-Basic Barnes' actions related to scene size-up and patient assessment are entwined with the determination of whether there was or was not a life-threatening condition at presentation. Despite this, Mr. Everlove was unwilling to commit to either path to whether Mr. Vanlandingham presented with a life-threatening condition. Nor was Mr. Everlove willing to state there was insufficient information for him to make that determination.

Mr. Everlove was playing unfair forensic games with this series of answers. If Mr. Everlove, as the emergency medical services expert in the case, cannot identify which scenario was present or explain why he cannot not – then his testimony is unhelpful to the jury. FRE 702(a-d). All of these answers emphasize Mr. Everlove's problem: if Mr. Everlove, with hundreds of pages of medical records, investigative reports, body armor camera video, etc. cannot reach an opinion on the pathway, how could Paramedic Tuttle be expected to do so in real time? Apparently recognizing this conundrum, Mr. Everlove refused to commit to either scenario (life-threatening vs. non-life-threatening) but also refused to commit to whether there was insufficient evidence available to him to make this

determination. If there was sufficient evidence, then Mr. Everlove should have answered the first pathway question; instead, Mr. Everlove choose to avoid taking any credible, reliable stance on any of these issues. Unfortunately for Mr. Everlove, a credible, reliable stance is exactly what FRE 702 requires. Reliable scientific acumen and methodology does not allow an expert to simply refuse to answer a question on such a vital issue.

Equally problematic as his inability to form an opinion on which of the two pathways was more likely, however, is Mr. Everlove's blatant refusal to provide an answer whether he has an opinion, one way or the other, or whether he lacked sufficient information to form such an opinion. AMRAS was entitled to know if Mr. Everlove believed one scenario was more likely than the other. With Mr. Everlove choosing not to answer those repeated questions, AMRAS was entitled to know whether Mr. Everlove believed he had an insufficient basis to form an opinion on that critical subject. The fact that Mr. Everlove was unwilling to take a position in any direction on these key issues renders his opinions unreliable and of no assistance to the jury.

## VI.   Mr. Everlove's Testimony Should be Limited Based on his Training and Experience.

### C. Mr. Everlove Should not be Allowed to Testify Regarding Mr. Vanlandingham's Diagnosis or Cause of Death.

Mr. Everlove's qualifications to testify are limited by whether those qualifications provide a foundation for the topics he offers testimony about. *Lippe v. Howard,* 287 F. Supp. 3d 1271, 1279 (W.D. Okla. 2018) (citing *Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082, 1092-93 (W.D. Okla. 2009)). After the expert's area of testimony is identified, then the determination can be made as to whether he is qualified to render the

opinions he is offered to address. *Id.* at 1279. Mr. Everlove's training and experience is that of a paramedic. *See* Everlove CV, Ex. 15.

As a paramedic, it is outside the scope of Mr. Everlove's training and experience to provide a differential diagnosis and/or make a cause of death determination. He admits the same.

> Q    And I'm not trying to diminish what paramedics do.  But my question specifically is, as far as a medical diagnosis as a physician would render, that's outside the scope that you will be testifying in this case?
> A    Yes.  And I didn't take your question as a sleight.  I acknowledge that physicians are going to offer causation opinions in this case and there are diagnoses provided by physicians based on cumulative testing and information gathered through in hospital systems, based on their education and training.

*See* Ex. 13, 40:5-15.

> Q    All right.  As a person that is licensed as a paramedic, are you qualified to render a specific diagnosis?
> A    I do not provide a differential diagnosis, as a physician would, in my role as a certified and licensed paramedic.

*See* Ex. 13, 39:10-15.  However, despite admitting he lacks qualifications to provide cause of death or differential diagnoses, Mr. Everlove skirted directly answering questions in his deposition, leaving open the question of how he will respond to such inquiries at trial. For example, Mr. Everlove was asked three times if he would be offering cause of death testimony and – while he generally denied he would and offered that other expert(s) would speak on this topic – he qualified his responses to the point his responses were meaningless.

Q   All right.  My specific question is, are
you going to contest that the MD that was the
medical examiner for the State of Oklahoma who
rendered a cause-of-death opinion that the cause was
atherosclerotic coronary artery disease was
incorrect?
            MR. BEHENNA:  Object to the form.
            THE WITNESS:  I hear the same question as
I previously answered.  My answer was given to the
best of my ability.  I understand that that's the
cause of death listed on the death certificate.  I
don't believe I used the word "contest."  But within
my area of expertise based on my education and
training, that the predictable and preventable
outcome of death to Mr. Vanlandingham was based on
these deviations in the standard of care.

*See* Ex. 13, 42:4-19 (full inquiry at pp. 40:16-42:19). Mr. Everlove is not qualified by

training and/or experience to offer testimony regarding cause of death and/or diagnosis of

Mr. Vanlandingham's underlying medical condition and AMRAS requests a ruling, *in*

*limine*, that such testimony be precluded at trial.

### D.  Mr. Everlove Should be Precluded from Opining on the Impact Versed had on Mr. Vanlandingham's Death.

        Similarly, Mr. Everlove is not a pharmacologist/toxicologist and has no background

in either discipline. *See* Ex. 15. He did not do any research about the amounts of Versed

contained in Mr. Vanlandingham's blood serum at the time of autopsy. *See* Ex. 13, 170:12-

18. While admitting he did not do this work, he goes on to state that he "didn't see any

scientific evidence to support some of the opinions that [he] saw, based on [his]

understanding of the standard of care", referring to work by other experts. *See* Ex. 13,

170:12-18. This is another example of Mr. Everlove stepping out of his lane and being

willing to opine on topics where he lacks expertise and has not done any work to qualify any opinions he might have as "expert" testimony. In this case, there are actual medical experts in the areas of pharmacology, toxicology, emergency medicine, and pathology who will provide testimony as to the actual impact Versed would have had on Mr. Vanlandingham in the time between administration and his almost immediate cardiac event. Mr. Everlove's non-expert observation that "it is a known or should have been known adverse effect of respiratory depression with Vered administration is common in prehospital patients" should be excluded. *See* Ex. 13, 171:5-15 (full inquiry at pp. 170-178). Simply because something can occur under certain circumstances does not rise to the level of expert opinion. Expert opinion must be based on application of medical principles to the scientific evidence that is available for analysis that the circumstance did in fact occur. Mr. Everlove's training and experience do not qualify him to offer testimony about the impact Versed had on Mr. Vanlandingham in this case and should be precluded.

WHEREFORE, premises considered, Defendant American Medical Response Ambulance Service, Inc. moves the Court for an Order that precludes the testimony of Plaintiff's expert John Everlove in its entirety. In the alternative, AMRAS moves the Court to preclude testimony from Mr. Everlove that is outside his area of expertise and/or where he failed to provide full and forthright responses to topics covered at his deposition.

Respectfully submitted,

**RHODES, HIERONYMUS, JONES, TUCKER & GABLE, P.L.L.C.**

BY: */s/ Nathan E. Clark, OBA #17275*
      NATHAN E. CLARK, OBA #17275
      DENELDA L. RICHARDSON, OBA #20103
      Two West 2nd Street, Suite 1000 (74103-3131)
      P.O. Box 21100
      Tulsa, Oklahoma 74121-1100
      Telephone:   918/582-1173
      Facsimile:   918/592-3390
      nclark@rhodesokla.com
      drichardson@rhodesokla.com
      ATTORNEYS FOR DEFENDANT, AMERICAN
      MEDICAL RESPONSE AMBULANCE SERVICE, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2025, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

W. Brett Behenna                          bb@lawfirmokc.com
KRAHL GOERKE MEYER & BEHENNA, PLLC
**Attorneys for Plaintiff**

Jeramy Jarman                             Jeramy.jarman@okc.gov
Assistant Municipal Counselor
200 N. Walker, 4th Floor
Oklahoma City, OK 73102
**Attorneys for Defendant, City of Oklahoma City**

Katie Goff                                katie.goff@okc.gov
Richard N. Mann                           richard.mann@okc.gov
Assistant Municipal Counselors
**Attorneys for Defendants, City of Oklahoma City,**
**Fireman Kevin D. Rolke, Fireman Trevor Lewis,**
**Fireman Shawn M. Morton, and Fireman Zachary Osten**

W.R. Moon, Jr.                            wrm@czwlaw.com
Chris J. Collins                          cjc@czwlaw.com
Stacey Haws Felkner                       shf@czwlaw.com
COLLINS, ZORN, JONES & WAGNER, PC
**Attorneys for Defendant, Officer Brandon Lee**

                                          */s/ Nathan E. Clark, OBA #17275*