# Acclaim Consulting & Educational Services, Inc.

## Expert Report

In the United States District Court for the
Western District of Oklahoma

CHARLES KALEB VANLANDINGHAM,
Administrator for the Estate of CHARLES
LAMAR VANLANDINGHAM,
Plaintiff,

-vs-

CITY OF OKLAHOMA CITY, et al.
Defendants.

<u>Case No.:</u>

CIV-22-209-D

<u>Prepared for:</u>

W. Brett Behenna, Esquire
Behenna, Goerke, Krahl, & Meyer
210 Park Avenue, Suite 3030
Oklahoma City, OK 73102

<u>Prepared by:</u>

John B. Everlove, MS, NRP

<u>Date prepared:</u>

July 5, 2024

EXHIBIT

12

**CONFIDENTIAL Pursuant to Protective Order in 22-CV-209-D**

**VANLANDINGHAM 000468**

1

2  The following is an expert report regarding the subject event involving Charles

3  Vanlandingham. The opinions herein are based on my own knowledge and offered to a

4  reasonable degree of certainty for Emergency Medical Services providers. If called as a witness,

5  I would and could competently testify to the following.

6                                    **Qualifications**

7  I am submitting this written report expressing my opinions and conclusions in the above-

8  referenced matter. My comments and opinions are based upon the specifics of this case and my

9  knowledge and abilities in this domain. I hold a national Paramedic certification, as well as

10  Paramedic licenses in Michigan, Florida, and the State of California where I am currently

11  employed. Additionally, I hold a Master of Science Degree in Emergency Services Administration

12  and Emergency Management.

13  Serving as an Emergency Medical Technician (EMT), Paramedic, Paramedic

14  Preceptor, Field Training Officer, Paramedic/Firefighter and Battalion Chief in charge of

15  Emergency Medical Services (EMS) Operations, I have treated and transported patients and have

16  trained and educated pre-hospital caregiver personnel regarding patient assessment, scene

17  management, emergency medical treatment, patient transportation and ambulance operations.

18  As an EMS Education Program Director, Department Chairperson and Lead Faculty,

19  I have educated, trained, and evaluated EMS students regarding the standard of care of

20  patients in accordance with the Department of Transportation (DOT) regulations and National

21  Highway Traffic Safety Administration (NHTSA) guidelines for EMS personnel, as well as

22  state and local policies, procedures and protocols. Serving as Paramedic Associate Supervisor

23  and Paramedic Operations Supervisor, my primary responsibilities included the response and

1

1   management of emergency calls for service, as well as the supervision of all employees

2   regarding EMS dispatching of ambulance resources, EMS scene management, patient

3   assessment, patient treatment, patient care and patient transportation.

4       Additionally, as Paramedic Operations Supervisor and Clinical Manager, I designed,

5   developed, and implemented ambulance call-taking and dispatching of EMS resources, including

6   policies, procedures, and operational assignment of resources, all within federal, state, and local

7   regulatory guidelines. The duties of these positions included implementation of training

8   standards related to dispatching, scene management, interagency operations, patient assessment,

9   patient treatment, patient care and patient transportation.

10      Serving as the Clinical Manager and Clinical Education Specialist, my duties included

11  investigation of all incidents related to EMS scene management, patient assessment, patient

12  care and patient transportation, as well as the oversight and management of the Clinical Quality

13  Assurance (CQA) and Clinical Quality Improvement (CQI) programs relevant to EMS services

14  personnel, including law enforcement personnel, fire personnel, EMTs and Paramedics. I have

15  personally responded to thousands of emergency medical calls for service like calls for service

16  involving patient triage, treatment and transportation during multi-casualty incidents, traffic

17  collisions involving multiple vehicles and involved parties; and trauma patient assessment, care,

18  management, and transportation of patients, in similar communities like the location of the subject

19  event and involving similar patient conditions as in the subject event involving Charles

20  Vanlandingham.

21      As an expert, I have been retained by attorneys representing both plaintiffs and

22  defendants and have offered opinions on said topics in litigation matters. My estimated current

2

VANLANDINGHAM 000470

1    caseload for work as an expert is approximately 65% on behalf of the plaintiffs and 35% on behalf

2    of the defendants. Attached hereto is my current curriculum vitae.

3    **Limitation Statement**

4    My opinions are based on the information available to me as of the date of this report. I

5    reserve the right to supplement, amend and/or modify this report and my opinions considering

6    any additional information hereafter, such as deposition transcripts, expert reports, audio

7    communication, legal documents or records, pictures, video documentation or any additional

8    applicable items.

9    **Materials and Records**

10   (2022, November 30). *Answer of American Medical Response Ambulance Service, Inc. to*

11       *Plaintiff's Third Amended Complaint.*

12   AMR. (2021, July 23). *Response to Plaintiff's First Requests for Production fo Documents.*

13   Barton, M.D., L. (2019, November 22). Office of the Chief Medical Examiner. *Report of*

14       *Investigation by Medical Examiner.*

15   Behenna, B. (2020, January 10). *OCPD Records Request.*

16   Behenna, B. (2022, November 16). *Third Amended Complaint.*

17   Bledsoe, B., Cherry, R., & Porter, R. (2017). Paramedic Care: Principles & Practice. *2, Fifth*

18       *Edition.* Pearson.

19   Boxwell, D. (2019, September 15). *Body Worn Camera Footage of Subject Event.*

20   Busch, J. (2020, January 30). *Oklahoma City Police Department Use of Force Report.*

21   Cain, B. (2019, September 15). *Body Worn Camera Footage of Subject Event.*

22   Cain, B. (2019, September 15). Oklahoma City Police Department. *Incident Report.*

23   Chaney, C. (2019, September 15). *EMS Patient Care Report.*

3

**CONFIDENTIAL Pursuant to Protective Order in 22-CV-209-D**       **VANLANDINGHAM 000471**

1   Clark, N. (2022, July 11). *American Medical Response Ambulance Service, Inc., Rule 26 Initial*

2       *Disclosures.*

3   DeGiusti, T. (2023, June 13). *Scheduling Order.*

4   DeGiusti, T. (2023, July 14). *Stipulated Protective Order.*

5   DeGiusti, T. (2023, May 19). *Order-Motion To Dismiss; Third Amended Complaint.*

6   DeGiusti, T. (2024, March 27). *Amended Scheduling Order.*

7   EMS MCB. (2019). EMS System for Metropolitan Oklahoma City and Tulsa. *Medical Control*

8       *Board Treatment Protocols.*

9   EMSA. (n.d.). *Production Log.*

10  EMSA. (n.d.). *Employee Incident Reports of Subject Event.*

11  EMSA. (n.d.). *Employment File-Giles, C.*

12  EMSA. (n.d.). *Employment File-Chaney, C.*

13  EMSA. (n.d.). *Employment File-Karagavoorian.*

14  EMSA. (n.d.). *Employment File-Barnes, S.*

15  EMSA. (n.d.). *Employment File-Tuttle, W.*

16  EMSA. (n.d.). *Credentialing File-Chaney.*

17  EMSA. (n.d.). *Credentialing File-Barnes.*

18  EMSA. (n.d.). *Credentialing File-Karagavoorian.*

19  EMSA. (n.d.). *Credentialing File-Giles.*

20  EMSA. (2019, September 15). Cody Chaney Cardiac Monitor and Defibrilator Report. *LIFEPAK*

21      *15 Continuous Complete Electrocardiogram-Vanlandingham, Lamar.*

22  Frazier, D. (2019, September 15). *Body Worn Camera Footage of Subject Event.*

23  Frazier, D. (2019, September 15). *Crime Scene Presence and Entry Log Sheet.*

4

1  Garner, J. (2019, September 15). *Body Worn Camera Footage of Subject Event.*

2  Giles, C. (2019, September 15). *Patient Care Report.*

3  Glockner, S. (n.d.). *Defendants' Answers to Plaintiff's Rule 213(f) Interrogatories.*

4  Glockner, S. (2023, October 17). *Response to Supplemental Request To Produce.*

5  Glockner, S. (2023, July 7). *City's Response to Request To Produce.*

6  Glockner, S. (2023, July 7). *City's Response to Interrogatories.*

7  Goff, K. (2022, July 11). *City of Oklahoma's Initial Rule 26 Disclosures.*

8  Goff, K. (2022, November 30). *Answer of Defendant City of Oklahoma City to Plaintiff's Third*
9      *Amended Complaint.*

10  Karren, K. J., & Mistovich, J. J. (2014). *Prehospital Emergency Care* (11th ed.). New York, New
11      York: Pearson.

12  Klicka, M. (2019, September 15). *Video Interview Footage-Christopher Giles.*

13  Klicka, M. (2019, September 15). *Video Interview Footage-Cody Chaney.*

14  Klicka, M. (2019, September 15). *Video Interview Footage-Miranda Karagovoorian.*

15  Klicka, M. (2019, September 15). *Video Interview Footage-Skyler Barnes.*

16  Klicka, M. (2019, September 15). *Video Interview Footage-William Tuttle.*

17  Klicka, M. (2019, September 15). Oklahoma City Police Department. *Incident Report-Investigator*
18      *Scene Report.*

19  Laurencio, Isaac L. (2019, September 15). *Oklahoma City Fire Department National Fire Incident*
20      *Reporting System Report.*

21  Lee, B. (2019, September 15). *Body Worn Camera Footage of Subject Event.*

22  Lee, B. (2019, September 15). Oklahoma City Police Department. *Body Worn Camera Footage*
23      *and Interview Records.*

5

1   Lee, B. (2023, June 2). *Answer to Defendant Brandon Lee to Plaintiff's Third Amended Complaint.*

2   Limmer, D., & O'Keefe, M. (2016). *Emegency Care* (13th ed.). Pearson.

3   Lundblad, M. (2023, January 18). *First Amended Complaint at Law.*

4   National EMS Scope of Practice Model. (2010).

5   National Registry of Emergency Medical Technicians- NREMT. (2014). *Practical Exam Skills*

6       *Sheets.*

7   OCFD. (n.d.). *Academy and In-Service Training Records-Morton, S.*

8   OCFD. (n.d.). *Academy and In-Service Training Records-Osten, Z.*

9   OCFD. (n.d.). *Academy and In-Service Training Records-Rolke, K.*

10  OCFD. (n.d.). *Operations/Emergency Medical (OKC-017949-OKC-017999).*

11  OCFD. (n.d.). *Operations/Training Manual (OKC-018309-OKC-18326).*

12  OCFD. (n.d.). *Operations/Suppression Manual (OKC-18102-OKC-18308).*

13  OCFD. (n.d.). *Operations/Special Operations (OKC-18000-OKC-18101).*

14  OCFD. (2019, September 15). *EMS Incident Report.*

15  OCPD. (2019, September 15). *Crime Scene Pictures of Crime Scene and Personnel.*

16  OCPD. (2019, September 9). *Operations Manual, 5th Edition.*

17  OCPD. (2019, September 15). *Multiple Pictures of Crime Scene and Mr. Vanlandingham.*

18  OCPD. (2019, September 15). *Police Supplemental Reports.*

19  OCPD. (2020, September 11). *Operations Manual, 5th Edition.*

20  OCPD. (2020, July 1). *Operations Manual, 5th Edition.*

21  OCPD. (2020, February 28). *Operations Manual, 5th Edition.*

22  OCPD. (2023, July 21). *Operations Manual, 5th Edition.*

23  OCPD. (2023, August 24). *Operations Manual, 5th Edition.*

6

1     OCPD FOP. (n.d.). *Collective Bargaining Agreement FY 2018-2019.*

2     OCPD FOP. (2019, October 8). *Collective Bargaining Agreement FY 2019-2020.*

3     OKC. (2019, September 15). *Lab Photos (OKC-000129-OKC-000153).*

4     Oklahoma City. (2023, July 11). *City's Responses to Plaintiff's Request for Production-Without*
5         *Documents.*

6     Oklahoma Statutes. (2024, July 1). Title 63. Public Health and Safety. *Chapter 1, Article 25,*
7         *Section 1-2504 - Use of Emergency Medical Technician, Intermediate, Advanced*
8         *Emergency Medical Technician or.* Retrieved from https://oklahoma.gov

9     Paramedic National Emergency Medical Services Education Standards. (2009). *Paramedic*
10        *Instructional Guidelines .*

11     Physio Control. (2019, September 16). *CPR Annotation of Subject Event.*

12     Pickle. (2019, September 15). Oklahoma City Police Department. *Crime Scene Unit Report.*

13     Pulliam, J. (2021, September 15). *OCFD Response to Open Records Request.*

14     Sanders, M. J. (2012). *Mosby's Paramedic Textbook.* Jones & Bartlett Learning.

15     Seller, M. (2019, September 15). *Incident Report-Morton.*

16     Sellers, M. . (2019, September 15). *Audio Interview Recording-Lewis.*

17     Sellers, M. (2019, September 15). *Incident Report-Hancock.*

18     Sellers, M. (2019, September 15). *Incident Report-Karagovoorian.*

19     Sellers, M. (2019, September 15). *Incident Report-Bailey.*

20     Sellers, M. (2019, September 15). *Incident Report-Chaney.*

21     Sellers, M. (2019, September 15). *Incident Report-Tuttle.*

22     Sellers, M. (2019, September 15). *Incident Report-Rolke.*

23     Sellers, M. (2019, September 15). *Incident Report-Barnes.*

**CONFIDENTIAL Pursuant to Protective Order in 22-CV-209-D**        **VANLANDINGHAM 000475**

1   Sellers, M. (2019, September 15). *Incident Report-Lewis.*

2   Sellers, M. (2019, September 15). *Incident Report-Osten.*

3   Sellers, M. (2019, September 15). *Incident Report-Giles.*

4   Sellers, M. (2019, September 15). *Audio Interview Recording-Skylar Barnes.*

5   Sellers, M. (2019, September 15). *Audio Interview Recording-Morton.*

6   Sellers, M. (2019, September 15). *Audio Interview Recording-Rolke.*

7   Sellers, M. (2019, September 15). *Audio Interview Recording-Osten.*

8   Tompkins, B. (2019, September 18). *OCPD Request for EMSA Records.*

9   Tuttle, B. (2019, September 15). *Patient Care Report.*

10  Vanlandingham, C. (2022, August 12). *Plaintiff's First Reqeust for Production of Documents to*
11      *Defendant, American Medical Response, Inc.*

12  Vanlandingham, C. (2022, August 12). Plaintiff's First Request for Production of Documents to
13      Defendant City of Oklahoma City.

14  Vanlandingham, C. (2023, September 20). *Plaintiff's Notice of Subpoena to Produce Documents,*
15      *Information, or Objects in a Civil Action.*

16  VisiNet 911. (2019, September 15). *Inicident Detail Report.*

17  VisiNet 911. (2019, September 15). *Multiple Audio Records of 911 Call and Unit Radio Traffic.*

18  Williams, D. (2019, September 15). *Body Worn Camera Footage of Subject Event.*

19  Zoll Medical Corporation. (2015). *ResQCPR System Product Brochure.*

CONFIDENTIAL Pursuant to Protective Order in 22-CV-209-D                    VANLANDINGHAM 000476

**Summary of Subject Event**

2          On September 15, 2019, at approximately 0354 hours, Teresa Hancock ("Ms. Hancock")

3   called 911 from her residence located at 3037 Sahoma Trail, in Oklahoma City, Oklahoma. Ms.

4   Hancock called 911 seeking help for her boyfriend, Charles Vanlandingham ("Mr.

5   Vanlandingham"). Ms. Hancock stated she woke up to use the bathroom and returned to the

6   bedroom to find Mr. Vanlandingham with his eyes rolled back, with noisy breathing and full body

7   shaking (VisiNet 911, 2019).

8          The 911 call taker was trained in Emergency Medical Dispatch ("EMD") techniques and

9   provided Ms. Hancock with medical care instructions to help care for Mr. Vanlandingham while

10  an EMSA unit was dispatched and enroute to the Vanlandingham residence, "Priority 2-Emergent

11  Condition with No Life Threats" for "Convulsions/Seizures" (Tuttle, B., 2019; VisiNet 911, 2019).

12  The medical care instructions included but was not limited to, providing reassurance to Ms.

13  Hancock so she could care for her boyfriend, instructing Ms. Hancock to move Mr.

14  Vanlandingham to his side to support his airway and breathing, and guiding Ms. Hancock on

15  common findings in seizure patients like the presence of a postictal state which includes

16  disorientation and an inability to follow commands (Tuttle, B., 2019; VisiNet 911, 2019).

17         The 911 call taker stayed on the phone with Ms. Hancock until EMSA Ambulance 459,

18  staffed with American Medical Response Ambulance Service, Inc. Paramedic Bill Tuttle

19  ("Paramedic Tuttle") and American Medical Response Ambulance Service, Inc. Emergency

20  Medical Technician Skyler Barnes ("EMT Barnes"), arrived on scene at the Vanlandingham

21  residence at 0403 hours (Tuttle, B., 2019).

22         According to the Patient Care Report completed by Paramedic Tuttle, he and EMT Barnes

23  contacted Mr. Vanlandingham at 0405 hours. Upon patient contact, Paramedic Tuttle and EMT

9

1     Barnes stated Mr. Vanlandingham was confused with an altered mental status, was in a postictal

2     state and disoriented, and lying in bed in the bedroom. Paramedic Tuttle and EMT Barnes, brought

3     some medical equipment into the residence which included an ambulance cot and a Physio Control

4     LIFEPAK15 Cardiac Monitor and Defibrillator (Physio Control, 2019).

5           Paramedic Tuttle and EMT Barnes stated they found medications prescribed to Mr.

6     Vanlandingham which included Trazadone for sleep, and Lisinopril for hypertension. Paramedic

7     Tuttle and EMT Barnes did not obtain any vital signs, perform any clinical care monitoring of Mr.

8     Vanlandingham, but did obtain a blood glucose level (BGL) which was 137 mg/dL, which was

9     within normal limits for an adult patient. Paramedic Tuttle, who completed the Patient Care Report

10     (PCR) of the subject event, documented at 0406 hours, Mr. Vanlandingham had normal radial

11     pulses, normal respirations, and a patent airway. Paramedic Tuttle also documented at 0406 hours,

12     that Mr. Vanlandingham was pale and had diaphoretic skins signs, which Paramedic Tuttle later

13     stated in an interview, was consistent with a patient who was having a cardiac event (Klicka, M.,

14     2019).

15           After obtaining a blood glucose level, Paramedic Tuttle and EMT Barnes instructed Mr.

16     Vanlandingham to move to the ambulance cot and they stated, they attempted to assist him because

17     he was only able to move part way in between the bed and the ambulance cot.  When Paramedic

18     Tuttle placed his hands on Mr. Vanlandingham's arm to assist him, Paramedic Tuttle stated, Mr.

19     Vanlandingham attempted to bite his arm.  Paramedic Tuttle stated Mr. Vanlandingham attempted

20     to bite Paramedic Tuttle's arm a "couple" of times when Paramedic Tuttle tried to move Mr.

21     Vanlandingham, and Paramedic Tuttle grabbed Mr. Vanlandingham from behind, wrapping his

22     arms around Mr. Vanlandingham from the back and forcing Mr. Vanlandingham against the

23     ambulance cot to "hold him there" until help could arrive (Klicka, M., 2019; Lee, B., 2019; Sellers,

10

1    M., 2019; VisiNet 911, 2019).  EMT Barnes left the bedroom after pressing the "emergency"

2    button on the hand held radio because the handheld radios were not able to reach the dispatch

3    center (Klicka, M., 2019; Lee, B., 2019; Sellers, M., 2019; VisiNet 911, 2019).

4         Paramedic Tuttle continued to physically restrain Mr. Vanlandingham until Oklahoma City

5    Fire Department personnel ("OCFD") and Oklahoma City Police Department ("OCPD") personnel

6    arrived on scene to help physically restrain Mr. Vanlandingham and place him in handcuffs.  Once

7    secured in handcuffs by OCPD personnel, OCPD and OCFD personnel continued to use force

8    against Mr. Vanlandingham to keep him in the prone position on the floor of the bedroom, while

9    Paramedic Tuttle obtained a chemical sedative, Versed, and injected it into Mr. Vanlandingham's

10   arm.  Shortly thereafter, additional AMR personnel arrived on scene, and found Mr.

11   Vanlandingham not breathing and without a pulse.  Paramedic Tuttle was removed from the call,

12   the additional AMR personnel took over the care of Mr. Vanlandingham, but despite on scene

13   resuscitative efforts, Mr. Vanlandingham died at 0501 hours (Chaney, C., 2019).

14                    **Standard of Care for Charles Vanlandingham**

15        The requisite standard of care for the assessment, care, treatment, management,

16   interventions, and transportation of a patient such as Mr. Vanlandingham during the subject event,

17   is well established by multiple sources including clinical instructional materials, clinical medical

18   studies and supporting literature, initial and ongoing education programs text materials, as well as

19   federal, state, and local statues, regulations, policies, procedures, and protocols.

20        The EMS System for Metropolitan Oklahoma City and Tulsa 2019 Medical Control Board

21   Treatment Protocols ("Protocols") are established under the authority of the agency Medical

22   Director, to create consistent requirements for all prehospital care providers working for the

                                                                              11

1    agency, like EMSA or the Oklahoma City Fire Department, with mandatory activities for the

2    management of prehospital patients within the jurisdiction.

3         The requisite and applicable assessment of a patient with signs and symptoms of a seizure,

4    such as Mr. Vanlandingham during the subject event mandates that emergency medical services

5    providers such as American Medical Response Ambulance Service, Inc. ("AMR") Paramedic Bill

6    Tuttle ("Paramedic Tuttle") and Emergency Medical Technician Skylar Barnes ("EMT Barnes"),

7    perform a Scene Size-Up, a Primary Assessment, a Secondary Assessment, and a Reassessment of

8    a patient's condition to provide the indicated and applicable care, interventions and treatment to a

9    patient under their care (Bledsoe, Cherry, & Porter, 2017; Karren & Mistovich, 2014; Limmer &

10   O'Keefe, 2016; National Registry of Emergency Medical Technicians- NREMT, 2014; Paramedic

11   National Emergency Medical Services Education Standards, 2009; Sanders, 2012).

12   **Standard of Care for Scene Size Up**

13        The *Scene Size-Up* portion of the standardized approach to evaluation of an emergency call

14   for service, is used to ensure patient, rescuer, and bystander safety as part of prehospital care, and

15   also includes steps to determine the nature of illness ("NOI") for a medical patient and steps to

16   determine the mechanism of injury ("MOI") for a trauma patient (Bledsoe, Cherry, & Porter, 2017;

17   Karren & Mistovich, 2014; Limmer & O'Keefe, 2016; National Registry of Emergency Medical

18   Technicians- NREMT, 2014; Paramedic National Emergency Medical Services Education

19   Standards, 2009; Sanders, 2012).

20        The NOI is the illness the patient is complaining of, such as an altered level of

21   consciousness, a stroke, or a seizure (Limmer & O'Keefe, 2016; Sanders, 2012; Bledsoe, Cherry,

22   & Porter, 2017). Additionally, all EMS personnel are instructed to, "determine what resources are

12

CONFIDENTIAL Pursuant to Protective Order in 22-CV-209-D          VANLANDINGHAM 000480

1 needed to safely manage the event", during the Scene Size-Up to ensure patient and provider

2 safety, and appropriate treatment for the patient (Sanders, 2012).

3    The analysis of the scene by EMS personnel, based on another EMS text, instructs

4 prehospital care providers to:

5    "Also, check the environment for any evidence of poisoning, such as pill bottles,

6        and syringes. Look for prescription medications that might indicate a history of

7        epilepsy, diabetes, or heart disease" (Karren & Mistovich, 2014, p. 592).

8    The requisite Scene Size-Up guides patient care and treatment for illnesses secondary to

9 seizure signs and symptoms, and guides information gathering from witnesses, bystanders, and

10 family members regarding the patient's condition or events leading to the patient's condition

11 (Bledsoe, Cherry, & Porter, 2017; Karren & Mistovich, 2014; Limmer & O'Keefe, 2016; National

12 Registry of Emergency Medical Technicians- NREMT, 2014; National EMS Scope of Practice

13 Model, 2010; Sanders, 2012).

14    The people on scene of an emergency call, as witnesses or those familiar with the patient,

15 can inform emergency medical services providers regarding the pertinent medical history, the

16 history of the present illness or injury, and the events leading to the illness or injury (Bledsoe,

17 Cherry, & Porter, 2017; Karren & Mistovich, 2014; Limmer & O'Keefe, 2016; National Registry

18 of Emergency Medical Technicians- NREMT, 2014; National EMS Scope of Practice Model,

19 2010; Paramedic National Emergency Medical Services Education Standards, 2009; Sanders,

20 2012; EMS MCB, 2019).

21 **Standard of Care for the Primary Assessment of a Seizure Patient**

22    The systematic and organized approach to the patient assessment separated into two

23 portions known as the *Primary Assessment* and *Secondary Assessment* which prioritizes the

13

gathering of information from the patient to determine priorities in patient care and treatment (Bledsoe, Cherry, & Porter, 2017; Karren & Mistovich, 2014; Limmer & O'Keefe, 2016; National Registry of Emergency Medical Technicians- NREMT, 2014; National EMS Scope of Practice Model, 2010; Sanders, 2012). In regard to patients with seizures, one EMS text notes, "A seizure is not a disease but a sign of an underlying defect, injury, or disease" (Karren & Mistovich, 2014).

The EMS texts also contain language consistent with applicable clinical medical literature for prehospital care providers, that a seizure is a sign of an underlying life-threatening condition, including one text which states, "Some cardiac arrests are preceded by seizure activity because of a lack of oxygen and blood to the brain" (Karren & Mistovich, 2014; Paramedic National Emergency Medical Services Education Standards, 2009).

The assessment process is structured to ensure the entire patient is evaluated for associated signs and symptoms to rule out and treat life-threatening conditions, to prioritize care, and to protect the patient from harm caused by known risks from illnesses or injuries with foreseeable complications (Bledsoe, Cherry, & Porter, 2017; Karren & Mistovich, 2014; Limmer & O'Keefe, 2016; National Registry of Emergency Medical Technicians- NREMT, 2014; National EMS Scope of Practice Model, 2010; Sanders, 2012).

During the *Primary Assessment* phase, paramedics and EMTs are taught to assess the patient's level of consciousness, airway, breathing , and circulation (Karren & Mistovich, 2014; Sanders, 2012; EMS MCB, 2019). The Office of the Medical Director for the Metropolitan Oklahoma City and Tulsa Emergency Medical Services Medical Control Board, created, approved, and implemented *Treatment Protocols* to guide patient assessment, care, treatment, interventions, management, and transportation of patients such as Mr. Vanlandingham during the subject event (EMS MCB, 2019).

14

**CONFIDENTIAL Pursuant to Protective Order in 22-CV-209-D**

1   The EMS System for Metropolitan Oklahoma City and Tulsa Medical Contral Board

2   Treatment Protocols ("Protocols") also denote requisite assessment, care, treatment, interventions,

3   and management activities for the Primary Assessment of patients (EMS MCB, 2019)   For

4   example, the Protocols obligate prehospital care personnel to:

5           Airway: Evaluate the patency and mechanics of the airway. Is the patient able to

6           oxygenate and ventilate? Rapid intervention may be required during the assessment

7           phase if airway patency and protection is compromised.

8           Breathing: Expose the chest as required to accurately assess the mechanics of

9           respiration (taking into account patient privacy/modesty if in public location). Note

10          the rate, depth, and pattern of respirations and if any degree of respiratory distress

11          or effort. Auscultate breath sounds bilaterally.

12          Liberally obtain pulse oximetry readings and in patients with respiratory

13          difficulties, waveform capnography readings (if equipped, **Mandatory use if the

14          patient is intubated).

15          Circulation: The adequacy of a patient's circulation is best assessed first by

16          evaluating their level of consciousness and mental status. Next assess the location,

17          rate, and character of the pulse. Then check a blood pressure – preferably, manually

18          for at least the first reading. Apply the cardiac monitor (if equipped) liberally. (EMS

19          MCB 1A-Medical General Assessment Adulty & Pediatric; 1A.1)

20  The goal of the Primary Assessment is to provide a thorough evaluation of the patient's

21  airway, respiratory system, and cardiovascular system using basic and advanced life support

22  techniques and equipment. When following the standard of care, prehospital care personnel are

15

1 able to quickly identify those patients with immediate life-threatening conditions and provide

2 interventions to ensure patient recovery and survival.

3 **Standard of Care for Secondary Assessment of a Seizure Patient**

4       The procedure for performing a Secondary Assessment for a patient with an altered mental

5 status, or seizure, as outlined by the National Registry of Emergency Medical Technician

6 (NREMT) obligates emergency medical services providers to perform the following tasks based

7 on assessment of each body region:

8             Complete a head-to-toe assessment of the patient if the patient is relatively

9             medically stable. Obtain relevant history of past and current medical problems,

10             medications, allergies, and physicians/hospitals used in care plans to help guide

11             further assessment.

12             Reassess patients frequently, typically at least every 10 minutes, and more often if

13             critical illness is discovered and being treated. In the situations of an unstable

14             patient, vital signs should be assessed every 5 minutes, especially if hemodynamic

15             changes are occurring. (1A: Medical General Assessment-Adult & Pediatric, cont.;

16             1A,2)

17       The Secondary Assessment and History Taking phase of the patient assessment is also a

18 structured process designed to determine the patient's signs and symptoms, the patient's diagnostic

19 findings using patient monitoring equipment, the patient's past medical history, the patient's vital

20 signs, and then develop a treatment plan for the patient using indicated interventions (Bledsoe,

21 Cherry, & Porter, 2017; Karren & Mistovich, 2014; Limmer & O'Keefe, 2016; National Registry

22 of Emergency Medical Technicians- NREMT, 2014; National EMS Scope of Practice Model,

23 2010; Sanders, 2012; EMS MCB, 2019; Sanders, 2012).

16

**CONFIDENTIAL Pursuant to Protective Order in 22-CV-209-D**

1    Also known as the "head to toe" assessment, a Secondary Assessment performed within

2    the requisite and applicable standard of care for a patient with an altered mental status or seizure

3    is essential for prehospital care personnel, like Paramedic Tuttle and EMT Barnes because,

4    "Further emergency care will be based on the information you gain for the history and physical

5    exam. There are three major steps to the secondary assessment: Conduct a physical exam; Take

6    vital signs; and Obtain a history" (Bledsoe, Cherry, & Porter, 2017; Karren & Mistovich, 2014;

7    Limmer & O'Keefe, 2016; National Registry of Emergency Medical Technicians- NREMT, 2014;

8    National EMS Scope of Practice Model, 2010; Sanders, 2012; EMS MCB, 2019; Sanders, 2012).

9    Patients with an altered mental status and seizure activity are predictably at risk for life-

10   threatening conditions and rapid deterioration in their condition (Bledsoe, Cherry, & Porter, 2017;

11   Karren & Mistovich, 2014; Limmer & O'Keefe, 2016; National Registry of Emergency Medical

12   Technicians- NREMT, 2014; National EMS Scope of Practice Model, 2010; Sanders, 2012; EMS

13   MCB, 2019; Sanders, 2012). To reinforce the importance for prehospital care personnel to be

14   vigilant in their care of patients with an altered mental status and seizures, one text states, "During

15   the physical exam, maintaining a patent airway is always of prime importance" (Sanders, 2012, p.

16   787). By performing a thorough and comprehensive assessment of the patient's condition,

17   prehospital care personnel can identify and treat immediate life threats, develop a treatment plan

18   for the patient, and ensure successful patient outcomes.

19   **Standard of Care for Patient Restraint and Treatment of a Seizure Patient**

20   In most cases involving a patient who has experienced a "generalized seizure", patients

21   will present with a postictal phase in which patients have an altered mental status, confusion,

22   disorientation, and drowsiness after the "generalized seizure" activity has stopped (Limmer &

23   O'Keefe, 2016). "The length of the postictal phase may vary greatly from patient to patient. Some

17

patients come around immediately, whereas others take much longer. It is important to remember that some patients may become combative and even violent toward rescuers during this phase. Safety [patient and provider] should always be a priority," according to the National EMS Education Standards outlined in EMS texts (Limmer & O'Keefe, 2016; EMS MCB, 2019; Karren & Mistovich, 2014; Limmer & O'Keefe, 2016; Paramedic National Emergency Medical Services Education Standards, 2009; Sanders, 2012).

The postictal phase resolves over time, and the initial disorientation a patient experiences is not a barrier to patient care, even when the patient is initially uncooperative with patient care activities. When the prehospital care providers allow the patient's neurological system to recover from the generalized seizure activity patient's may remain disoriented, but do not continue to be uncooperative with patient assessment and treatment activities (Limmer & O'Keefe, 2016; EMS MCB, 2019; Karren & Mistovich, 2014; Limmer & O'Keefe, 2016; Paramedic National Emergency Medical Services Education Standards, 2009; Sanders, 2012).

As with all patient's with an altered mental status, patients who are in a postictal phase do not follow demands or commands because they are unable to understand information presented to them, not because they consciously disregard the prehospital care providers (Limmer & O'Keefe, 2016; EMS MCB, 2019; Karren & Mistovich, 2014; Limmer & O'Keefe, 2016; Paramedic National Emergency Medical Services Education Standards, 2009; Sanders, 2012).

Patient's often transition past the postictal phase while on scene with prehospital care providers, and may totally resolve their altered mental status prior to transportation to the hospital (Bledsoe, Cherry, & Porter, 2017; EMS MCB, 2019; Karren & Mistovich, 2014; Klicka, M., 2019; Klicka, M., 2019; Klicka, M., 2019; Limmer & O'Keefe, 2016; Paramedic National Emergency Medical Services Education Standards, 2009).

18

**CONFIDENTIAL Pursuant to Protective Order in 22-CV-209-D**                    **VANLANDINGHAM 000486**

1    The National EMS Education Standards, and supporting materials from the clinical

2    medical literature, emphasize key points for the management of a seizure patient, including:

3            The first step in the management of a patient with seizure activity is to protect the

4            patient from injury. This is best achieved by removing obstacles in the patient's

5            immediate area. If necessary, the patient can be moved to a safe environment, such

6            as a carpeted or soft, grassy area. *At no time should a patient with seizure activity*

7            *be restrained, nor objects be forced between the patient's teeth to maintain an*

8            *airway.* Restraining activity may harm the patient or paramedic crew.

9            (Sanders, 2012, p. 787)

10    The Protocols applicable to Paramedic Tuttle and EMT Barnes noted key steps to the

11    treatment to be provided to patients like Mr. Vanlandingham during the subject event. None of the

12    Protocols, or materials reviewed in this case, outline the use of force against a patient like that

13    employed by Paramedic Tuttle during the subject event.  The standard of care is clearly defined

14    by the activities to protect patients, ensure appropriate assessment, care, treatment, interventions,

15    management and transportation to ensure appropriate patient outcomes.

16                            **Deviations in the Standard of Care**

17    During the subject event, Charles Vanlandingham ("Mr. Vanlandingham") was suffering

18    from a medical emergency. The personnel for American Medical Response Ambulance Service,

19    Inc. ("AMR"), Paramedic Bill Tuttle ("Paramedic Tuttle")and Emergency Medical Technician

20    Skylar Barnes ("EMT Barnes"), grossly deviated from the standard of care for the requisite and

21    applicable patient assessment, management, care, treatment, and interventions for Charles

22    Vanlandingham in the following ways.

19

**CONFIDENTIAL Pursuant to Protective Order in 22-CV-209-D**                    **VANLANDINGHAM 000487**

**Deviations in the Standard of Care for Scene Size-Up**

The records, documents, recordings, and research materials reviewed in this matter support the opinion that Mr. Vanlandingham had a generalized seizure secondary to an underlying condition which precipitated the 911 call for service and required an emergent response. Upon arrival, Paramedic Tuttle and EMT Barnes identified Mr. Vanlandingham as a patient who was in a postictal phase while lying in bed. Mr. Vanlandingham was not oriented and according to Paramedic Tuttle, was following simple commands.

Based on the records, Mr. Vanlandingham had an identifiable immediate life threat based on his skin signs and symptoms, and his disorientation which was consistent with a possible cardiac event, according to Paramedic Tuttle (Klicka, M., 2019). The condition of Mr. Vanlandingham at the time Paramedic Tuttle and EMT Barnes encountered him was consistent with a patient that would require additional resources to help manage his condition during the subject event. However, Paramedic Tuttle and EMT Barnes did not summon additional resources until after Mr. Vanlandingham resisted being secured the ambulance cot, and only requested resources to use force on Mr. Vanlandingham, not provide him with additional care or treatment.

The dispatch of a lone ambulance to the Vanlandingham residence was not a barrier to requesting any and all additional needed resources to properly care for and manage the emergency call for service. The failure to identify the need for additional resources to treat Paramedic Tuttle's and EMT Barnes' patient, was a gross deviation in the standard of care, created an unsafe scene, interfered with the emergent assessment, care, management, treatment, and transportation of Mr. Vanlandingham, and produced predictable and preventable negative patient outcome to Mr. Vanlandingham.

20

CONFIDENTIAL Pursuant to Protective Order in 22-CV-209-D

VANLANDINGHAM 000488

**Deviations in the Standard of Care for Patient Assessment**

Mr. Vanlandingham suffered a seizure prior to arrival of AMR personnel, with identifiable signs and symptoms of an altered mental status after the seizure at the time Paramedic Tuttle and EMT Barnes arrived on scene, which was consistent with the information provided by the 911 caller, Mr. Vanlandingham's girlfriend, Ms. Hancock (Bledsoe, Cherry, & Porter, 2017; Karren & Mistovich, 2014; Limmer & O'Keefe, 2016; National Registry of Emergency Medical Technicians- NREMT, 2014; National EMS Scope of Practice Model, 2010; Paramedic National Emergency Medical Services Education Standards, 2009; Sanders, 2012).

Performing a thorough and comprehensive Secondary Assessment is a crucial responsibility of prehospital care providers and must include inspection, palpation, and auscultation of the patient's body regions and body systems to comport with the standard of care (Bledsoe, Cherry, & Porter, 2017; Karren & Mistovich, 2014; Limmer & O'Keefe, 2016; National Registry of Emergency Medical Technicians- NREMT, 2014; National EMS Scope of Practice Model, 2010; Sanders, 2012; EMS MCB, 2019; Sanders, 2012). Paramedic Tuttle and EMT Barnes only performed and documented a portion of a patient assessment of Mr. Vanlandingham that identified, "A patent airway, normal respirations, the presence of radial pulses, diaphoretic and pale skin signs" (Tuttle, B., 2019). No secondary assessment was performed or documented, and no patient monitoring devices were employed, despite the Protocols, education, and training requiring such activities for a patient like Mr. Vanlandingham (Bledsoe, Cherry, & Porter, 2017; EMS MCB, 2019; Giles, C., 2019; EMSA; Klicka, M., 2019; Limmer & O'Keefe, 2016; Lee, B., 2019; National Registry of Emergency Medical Technicians- NREMT, 2014; Physio Control, 2019; Sanders, 2012).

21

1        At the time of the change in Mr. Vanlandingham's behavior, Paramedic Tuttle and EMT

2 Barnes had initiated the transportation of Mr. Vanlandingham by attempting to move him to the

3 ambulance cot. However, even at this point in the call for service, nothing within the records shows

4 that Paramedic Tuttle and EMT Barnes performed the requisite assessment of Mr. Vanlandingham

5 related to the subject event and Mr. Vanlandingham had not received any monitoring of his

6 condition (Tuttle, B., 2019).

7        Moreover, prior to the administration of the CNS sedative (Versed) to Mr. Vanlandingham,

8 Paramedic Tuttle did not perform a Primary Assessment of Mr. Vanlandingham's airway,

9 breathing, circulation, nor did he perform any Secondary Assessment of Mr. Vanlandingham to

10 determine the root cause of Mr. Vallandigham's seizure, identify any other signs and symptoms of

11 Mr. Vanlandingham's condition, or determine underlying conditions that required immediate care,

12 treatment, or interventions (Bledsoe, Cherry, & Porter, 2017; Karren & Mistovich, 2014; Limmer

13 & O'Keefe, 2016; National Registry of Emergency Medical Technicians- NREMT, 2014; National

14 EMS Scope of Practice Model, 2010; Sanders, 2012; EMS MCB, 2019; Sanders, 2012).

15        The Patient Care Report created by Paramedic Tuttle for Mr. Vanlandingham is absent of

16 several interventions such as, Pulse Oximetry ($SPO_2$); End-Tidal Carbon Dioxide ($EtCO_2$);

17 Electrocardiogram (ECG) readings; pulse rate, rhythm and quality; respiratory rate, rhythm,

18 quality; blood pressure measurements; and pupil equality, reactivity and response to light; and

19 reassessment of all vital signs and functions (Bledsoe, Cherry, & Porter, 2017; Karren &

20 Mistovich, 2014; Limmer & O'Keefe, 2016; National Registry of Emergency Medical

21 Technicians- NREMT, 2014; National EMS Scope of Practice Model, 2010; Sanders, 2012; EMS

22 MCB, 2019; Sanders, 2012).

22

**CONFIDENTIAL Pursuant to Protective Order in 22-CV-209-D**

1      Despite the gross deviations in the standard of care regarding medication administration

2    and the omission of the requisite Primary and Secondary Assessment of Mr. Vanlandingham,

3    Paramedic Tuttle documented in the Patient Care Report, that he monitored and evaluated Mr.

4    Vanlandingham during the patient care, even though the video of the subject event contradicts the

5    documentation (Tuttle, B., 2019).  Once Mr. Vanlandingham was identified as being in cardiac

6    arrest by Paramedic Giles, after the administration of Versed by Paramedic Tuttle, Officer Lee's

7    body worn camera documented that Mr. Vanlandingham was not on the "monitor" and was not

8    being monitored (LIFEPAK 15) (Lee, B., 2019).

9      After additional AMR personnel found Mr. Vanlandingham in cardiac arrest, he was then

10   lifted from the hard flat surface of the floor to the ambulance cot where he was initially placed in

11   the seated position with his head raised before being lowered to a supine position (Lee, B., 2019).

12   The patient move from the floor to the ambulance cot, was performed without any lifesaving

13   interventions being performed and resulted in a preventable delay in the assessment and treatment

14   of a patient in cardiac arrest like Mr. Vanlandingham during the subject event (Bledsoe, Cherry,

15   & Porter, 2017; Karren & Mistovich, 2014; Limmer & O'Keefe, 2016; National Registry of

16   Emergency Medical Technicians- NREMT, 2014; National EMS Scope of Practice Model, 2010;

17   Sanders, 2012; EMS MCB, 2019; Sanders, 2012; Lee, B., 2019).

18     The collective acts and omissions of Paramedic Tuttle and EMT Barnes in the patient

19   assessment of Mr. Vanlandingham during the subject event, resulted in predictable, foreseeable,

20   and preventable negative outcomes, and represented gross deviation in the standard of care and a

21   reckless disregard for Mr. Vanlandingham's safety.

23

**CONFIDENTIAL Pursuant to Protective Order in 22-CV-209-D**

**Deviations in the Standard of Care for Patient Restraint and Treatment**

At all times during the subject event, Paramedic Tuttle was the lead prehospital care provider for the medical care and treatment of Mr. Vanlandingham (EMS MCB, 2019; OCFD; OCFD, 2019). Paramedic Tuttle was responsible for leading the assessment, care, management, treatment, interventions, and transportation provided to Mr. Vanlandingham during the subject event.

When Mr. Vanlandingham began to resist Paramedic Tuttle and the reported attempts to secure Mr. Vanlandingham to the ambulance cot, Paramedic Tuttle stated he, "wrapped him [Mr. Vanlandingham] up from behind and held on" (Klicka, M., 2019). One of the applicable Protocols for Paramedic Tuttle and EMT Barnes, Protocol 7B: Physical Restraint-Adult & Pediatric, requires prehospital care personnel to perform the following when deciding if the patient needs to be placed in physical restraints:

1. Assessment of mental status - Observe for uncontrolled agitation, combativeness, threats of violence to self or others, disorientation, altered mental status impeding medically necessary interventions, or pulling at necessary medical interventions (e.g., oxygen, IV lines, endotracheal tubes).

2. Alternatives to physical restraint- Reassurance, support of concerned parties (family, friends, coworkers, etc.), reorientation, diversionary activity, explanation of illness, injury, and medically necessary interventions.

3. Justification for physical restraint- Failure of alternatives to physical restraint, reduce likelihood of patient harm to self, reduce likelihood of patient harm to others, enable medically necessary interventions per EMS protocols.

4. Inform patient and concerned parties of physical restraint use.

24

1        5. Apply physical restraints.

2        The review and analysis of the materials, records, and documentation shows no evidence

3   that Paramedic Tuttle and EMT Barnes engaged in, "Alternatives to physical restraint-

4   Reassurance, support of concerned parties (family, friends, coworkers, etc.), reorientation,

5   diversionary activity, explanation of illness, injury, and medically necessary interventions" (EMS

6   MCB, 2019).

7        However, the cited Protocol requires prehospital care providers to engage in specific

8   actions when employing "Physical Restraints," not manual or the use of physical bodily force by

9   a prehospital care provider against a patient.

10       In fact, none of the applicable Protocols, and none of the clinical medical literature or texts

11  describe the use of physical bodily force on a patient to gain compliance or consent for care, in the

12  manner utilized by Paramedic Tuttle during the subject event. The use of physical force or manual

13  restraint requires prehospital care providers to:

14           Remember that the patient may not be responsible for his or her actions.

15           When planning the restraining action, include a backup plan in case the initial

16           attempt fails.

17           Make sure that  adequate help is available. This means that at least four capable

18           people should be available to help restrain an adult patient.

19           Keep in mind that the potential for personal injury and legal liability is always

20           present. (Sanders, 2012, p. 1045)

21       In this case, Paramedic Tuttle engaged in a physical altercation with Mr. Vanlandingham

22  and used physical bodily force to restrain Mr. Vanlandingham without performing any of the

23  requisite activities outlined above. Additionally, Paramedic Tuttle was aware of Mr.

25

CONFIDENTIAL Pursuant to Protective Order in 22-CV-209-D    VANLANDINGHAM 000493

Vanlandingham's confused mental status, the presence of signs and symptoms of a life threatening emergency, and his emergency condition, but maintained compression force and pressure around and upon Mr. Vanlandingham's chest. As described by Paramedic Tuttle, he grabbed Mr. Vanlandingham from behind, encircled his arms around Mr. Vanlandingham's chest, and forced Mr. Vanlandingham down onto the ambulance cot. The use of physical force was so great, that fire and law enforcement personnel all observed Paramedic Tuttle displaying signs of exhaustion, being amped up from an adrenaline response, and looking like he was worn out (Boxwell, D., 2019; Cain, B., 2019; Frazier, D., 2019; Klicka, M., 2019; Lee, B., 2019; OCPD, 2019; Sellers, M., 2019).

Furthermore, postmortem analysis of Mr. Vanlandingham showed evidence of traumatic injuries unrelated to resuscitation efforts, which included, "Left anterior forehead with superficial abrasion and contusion, Left anterior chest and abdomen with superficial contusions, Bilateral medial arms with contusions, Right posterior hand with abraded papule, Left anterior forearm with contusions, Bilateral forearms with ecchymoses, Anterior knees and legs with minor abrasions, Left lower back with a contusion and abrasions" (Barton, M.D., L., 2019).

According to Ms. Hancock, Paramedic Tuttle, and EMT Barnes, Mr. Vanlandingham did not suffer any traumatic injuries from the initial seizure event prior to AMR arrival on scene.

The bruising across the chest and abdomen noted by investigative personnel, the additional AMR responders, and the medical examiner was identified as being from the use of force by Paramedic Tuttle against Mr. Vanlandingham when Mr. Vanlandingham was forced down onto the raised arm rails of the ambulance cot by Paramedic Tuttle (Busch, J., 2020; EMSA; Klicka, M., 2019; OCPD, 2019).

26

1    The request for the response of police and fire personnel to assist Paramedic Tuttle and

2  EMT Barnes occurred after the use of physical bodily force by Paramedic Tuttle. Yet, Paramedic

3  Tuttle stated in his interview with an Oklahoma City Police Department ("OCPD"), that the use

4  of physical force by Paramedic Tuttle against Mr. Vanlandingham came after Mr. Vanlandingham

5  attempted to bite Paramedic Tuttle two or three times (Klicka, M., 2019). This implies multiple

6  opportunities to disengage from Mr. Vanlandingham, based on Paramedic Tuttle's own statements

7  that he pulled his hand away from Mr. Vanlandingham at several points in time.

8    During the totality of interaction with Paramedic Tuttle and EMT Barnes, Mr.

9  Vanlandingham was a patient with a medical emergency, not a criminal actor or combative subject

10  consciously intent on doing harm to those on scene, as evidenced by no threats made to Ms.

11  Hancock prior to arrival of Paramedic Tuttle and EMT Barnes. In fact, the change in Mr.

12  Vanlandingham's behavior, according to Paramedic Tuttle and EMT Barnes, came after the BGL

13  check which involved using a spring-loaded needle to puncture the skin on Mr. Vanlandingham's

14  finger to draw a blood sample. The BGL check is painful for patients. If Mr. Vanlandingham were

15  resistant to further interventions by Paramedic Tuttle and EMT Barnes, it would have been

16  reasonable that Mr. Vanlandingham would have associated the physical touch by Paramedic Tuttle

17  with pain, given the only intervention by the AMR personnel resulted in Mr. Vanlandingham

18  experiencing pain.

19    After reviewing all materials provided at the time of this report, and based on my education,

20  training, and experience, it was not reasonable to stay in Mr. Vanlandingham's bedroom if Mr.

21  Vanlandingham was becoming uncooperative. Based on Paramedic Tuttle's statements, Paramedic

22  Tuttle was not in between the ambulance cot and the patient's bed, but rather on the opposite side

23  of the patient with the ambulance cot in between him and Mr. Vanlandingham. The body worn

27

1    camera footage which shows the configuration of the bedroom Mr. Vanlandingham was in at the

2    time of the subject event along with the position of Paramedic Tuttle based on his own statements,

3    would have enabled Paramedic Tuttle to leave the residence without interference.

4         Instead, Paramedic Tuttle used unreasonable and excessive physical bodily force to

5    physically restrained Mr. Vanlandingham from a posterior position, with a reckless disregard for

6    Mr. Vanlandingham's safety and with predictable impairment of Mr. Vanlandingham's airway,

7    breathing, and circulation (Bledsoe, Cherry, & Porter, 2017; EMS MCB, 2019; EMSA; Klicka,

8    M., 2019; Limmer & O'Keefe, 2016; National Registry of Emergency Medical Technicians-

9    NREMT, 2014; OCPD, 2019; Lee, B., 2019; Sanders, 2012).

10        For approximately thirteen minutes, Mr. Vanlandingham had been physically restrained by

11    Paramedic Tuttle prior to Mr. Vanlandingham being placed in handcuffs by OCPD Officer

12    Brandon Lee ("Officer Lee"), despite the availability of soft physical restraints as outlined in the

13    Protocols (Klicka, M., 2019; Tuttle, B., 2019; Lee, B., 2019; Sellers, M., 2019; EMS MCB, 2019).

14    In fact, when questioned by AMR Emergency Medical Technician Miranda Karagavoorian ("EMT

15    Karagavoorian") and EMT Barnes, Paramedic Tuttle said, "I want him in cuffs. It is my call"

16    (Giles, C., 2019; Klicka, M., 2019; EMSA; Lee, B., 2019; OCPD, 2019).

17        The placement of handcuffs on Mr. Vanlandingham, at the medical direction of Paramedic

18    Tuttle, created a higher duty for Paramedic Tuttle to ensure Mr. Vanlandingham was properly

19    assessed and treated for known risks and predictable complications from prone positioning of a

20    patient and prone positioning of a patient with force and posterior restraint devices because at no

21    time is a patient to be treated and transported in a prone position (Bledsoe, Cherry, & Porter, 2017;

22    EMS MCB, 2019; OCPD, 2023; OCFD).

28

CONFIDENTIAL Pursuant to Protective Order in 22-CV-209-D VANLANDINGHAM 000496

1      A portion of the Protocols (PROTOCOL 7B: Physical Restraint – Adult & Pediatric, cont.;

2      7B.2) applicable to a patient in handcuffs, "During treatment and transport of a patient in law

3      enforcement-instituted restraints (including handcuffs), EMS professionals should monitor for and

4      advocate for change in restraints that compromise airway patency, respiratory mechanics, or

5      circulation (EMS MCB, 2019). Despite the standard of care which is considerate of the significant

6      risk to patient safety, the predictable complications and negative outcomes to a prone patient, the

7      clear direction in clinical medical literature about never placing a patient in the prone position, and

8      the preventable injuries to Mr. Vanlandingham, Paramedic Tuttle continued the restraint of Mr.

9      Vanlandingham without any vital signs, without any patient monitoring devices placed on Mr.

10     Vanlandingham, without any airway management, without any respiratory support, and without

11     any activities to ensure Mr. Vanlandingham's circulation and cardiac function (Bledsoe, Cherry,

12     & Porter, 2017; Chaney, C., 2019; EMS MCB, 2019; Giles, C., 2019; Karren & Mistovich, 2014;

13     Limmer & O'Keefe, 2016; Lee, B., 2019; Klicka, M., 2019; Sellers, M., 2019; EMSA).

14      Apart from the physical restraint of Mr. Vanlandingham, who had been posteriorly

15     restrained with two sets of handcuffs at approximately 0420 hours, and the continued physical

16     restraint of Mr. Vanlandingham on the bedroom floor as he lay in the prone position, Paramedic

17     Tuttle elected to administer a chemical sedative to Mr. Vanlandingham as a "Chemical Restraint"

18     (Bledsoe, Cherry, & Porter, 2017; Chaney, C., 2019; EMS MCB, 2019; Karren & Mistovich, 2014;

19     Klicka, M., 2019; Lee, B., 2019; Giles, C., 2019). However, Mr. Vanlandingham did not receive

20     a primary assessment or secondary assessment, and no vital signs were obtained prior to

21     administration of 5 milligrams (mg) of Versed [a sedative affecting the Central Nervous System

22     ("CNS") with known side effects like respiratory depression and respiratory arrest] (Bledsoe,

23     Cherry, & Porter, 2017; Karren & Mistovich, 2014; Limmer & O'Keefe, 2016; National Registry

CONFIDENTIAL Pursuant to Protective Order in 22-CV-209-D        VANLANDINGHAM 000497

1    of Emergency Medical Technicians- NREMT, 2014; National EMS Scope of Practice Model,

2    2010; Sanders, 2012; EMS MCB, 2019; Sanders, 2012).

3    Responders from AMR and other agencies, stated that Mr. Vanlandingham seemed to

4    suffer a rapid demise after the administration of Versed, but was not on the cardiac monitor at the

5    time he was "changing colors" (Chaney, C., 2019; EMS MCB, 2019; Giles, C., 2019; Lee, B.,

6    2019; Bledsoe, Cherry, & Porter, 2017; Sanders, 2012). According to the interview statement of

7    AMR Paramedic Christopher Giles ("Paramedic Giles") and the Patient Care Report he created,

8    he arrived on scene with Emergency Medical Technician Miranda Karagavoorian ("EMT

9    Karagavoorian") and observed Mr. Vanlandingham in the prone position, "pt was blue and was

10    having labored breathing and I [Paramedic Giles] advised them to let me roll the pt over and I

11    rolled him right lateral and he then took 2 more breaths and then went pulseless and apneic" (Giles,

12    C., 2019; Klicka, M., 2019; EMSA). Paramedic Tuttle stated, "Within 10-15 seconds of giving

13    Versed I noticed he [Mr. Vanlandingham] was having breathing issues, he [Mr. Vanlandingham]

14    was changing colors and the other crews took over (Klicka, M., 2019).

15    Although the Patient Care Report by Paramedic Giles states Mr. Vanlandingham was in

16    the supine position, the body work camera footage and supporting materials show Mr.

17    Vanlandingham was in the prone position with force being used against him while under the care

18    and control of Paramedic Tuttle (Busch, J., 2020; EMSA; Giles, C., 2019; Lee, B., 2019). Once

19    the patient care of Mr. Vanlandingham was assumed by Paramedic Giles and other prehospital

20    care providers, Paramedic Tuttle is observed on Officer Lee's body worn camera footage stating,

21    "I think I killed him [Mr. Vanlandingham]" (Lee, B., 2019).

22    The unreasonable and excessive use of physical force against Mr. Vanlandingham, the

23    excessive use of physical force against a prone patient, and the administration of a Chemical

CONFIDENTIAL Pursuant to Protective Order in 22-CV-209-D    VANLANDINGHAM 000498

1     Restraint to an emergent patient like Mr. Vanlandingham, as he was restrained in handcuffs in the

2     posterior position without any patient assessment, care, monitoring, or treatment activities by

3     Paramedic Tuttle and EMT Barnes, represented gross deviations in the standard of care and a

4     reckless disregard for Mr. Vanlandingham's safety. The collective acts and omissions of

5     Paramedic Tuttle and EMT Barnes, created injuries to Mr. Vanlandingham that were foreseeable,

6     based on the applicable clinical medical literature, Emergency Medical Services text materials, the

7     EMS System for Metropolitan Oklahoma City and Tulsa 2019 Medical Control Board Treatment

8     Protocols, and prehospital education and training.

9                                  **Conclusion**

10         The collective and cumulative acts and omissions in the requisite and applicable standard

11     of care American Medical Response Ambulance Service, Inc. Paramedic Bill Tuttle and American

12     Medical Response Ambulance Service, Inc. Emergency Medical Technician Skyler Barnes during

13     the subject event involving Charles Vanlandingham, represented gross deviations in the standard

14     of care. The reckless and conscious disregard for the safety of Charles Vanlandingham and the

15     resulting injuries and outcomes were predictable and preventable.

31