IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

CHARLES KALEB VANLANDINGHAM,       )
Administrator for the Estate of CHARLES       )
LAMAR VANLANDINGHAM,       )
                                      )
        Plaintiff,       )
                                      )
v.       )       Case No. CIV-22-209-D
                                      )
THE CITY OF OKLAHOMA CITY,       )
a municipal corporation; et al.,       )
                                      )
        Defendants.       )

## ORDER

Before the Court is Defendant City of Oklahoma City's Motion for Summary Judgment and Brief in Support [Doc. No. 122]. Plaintiff filed a response [Doc. No. 173], to which Defendant filed a reply [Doc. No. 197]. Also before the Court is the Motion for Summary Judgment of Defendant Brandon Lee and Brief in Support [Doc. No. 124]. Plaintiff filed a response [Doc. No. 183], Defendant filed a reply [Doc. No. 200], and Plaintiff filed a surreply [Doc. No. 203]. The matters are fully briefed and at issue.

## UNDISPUTED MATERIAL FACTS

On September 15, 2019, at approximately 3:54 a.m., Theresa Hancock called 911 seeking help for her boyfriend, Charles Vanlandingham, who was having a medical emergency [Doc. No. 122, at 11]. Paramedics employed by American Medical Response Ambulance Service were dispatched to the home where they found Mr. Vanlandingham on a bed [Def. Lee UMF 3]. One of the paramedics attempted to move him from the bed to a cot. *Id.* at 5-7. It is disputed as to how Mr. Vanlandingham responded to this, but it is

1

undisputed that at some point during this attempt, the paramedic pushed his panic button and sent another paramedic to the ambulance to call for assistance from both the fire department and Oklahoma City police officers. *Id.*

Shortly thereafter, four firefighters arrived at the scene and were told by the paramedic standing outside that her partner was inside the home and needed assistance. *Id.* at 8, 9. The first firefighter entered the home and found the paramedic struggling with Mr. Vanlandingham. *Id.* at 10. After several minutes, the firefighter placed Mr. Vanlandingham on the ground in a prone position. *Id.* at 19.

Approximately 20 minutes after Ms. Hancock first called for help, the Oklahoma City Police Department (OCPD) dispatcher asked over the radio for an officer to assist the paramedics because they reported that they were not safe. *Id.* at 12. Almost immediately, Officer Brandon Lee responded that he was "running code," meaning that he had the lights and sirens on his patrol car turned on and was responding to the scene as quickly as he could. *Id.* Officer Lee arrived on the scene and was updated from dispatch that "apparently they're being combative with fire." *Id.* at 13.

Upon entering the home, Officer Lee went to the room where Mr. Vanlandingham was located and saw him wheezing and experiencing labored breaching [Pl.'s AMF No. 14]. A paramedic asked Officer Lee if he had a set of handcuffs, to which Officer Lee immediately responded by securing two sets of handcuffs on Mr. Vanlandingham [Def. Lee UMF Nos. 15, 16]. Although someone on the scene asked whether soft restraints should be used, the paramedic stated that it was his call and he wanted Mr. Vanlandingham to remain handcuffed until he was in the ambulance. *Id.* at 22. OCPD policies and procedures require

police officers to allow trained medical personnel to make all medical treatment decisions for individuals in police custody. *Id.* at 27.

Once Mr. Vanlandingham was restrained, Officer Lee told dispatch that he was in custody but needed the assistance of another officer. *Id.* at 17. He proceeded to place his shin across Mr. Vanlandingham's back while four other firefighters held him down. *Id.* at 18. Officer Lee estimates that he placed 10% to 20% of his total body weight on Mr. Vanlandingham for approximately 90 seconds. *Id.* at 21. Another firefighter was holding and bending Mr. Vanlandingham's right leg to his buttocks while his other leg was held down by another firefighter [Pl.'s AMF No. 27]. While Mr. Vanlandingham was still handcuffed, the paramedics administered 5mg of Versed, and within seconds he became unresponsive [Def. City UMF No. 23].

Officer Lee removed the handcuffs and left the room [Def. Lee UMF No. 25]. Paramedics then began to render emergency aid for approximately 30 minutes, but it was unsuccessful and Mr. Vanlandingham was pronounced dead at the scene. *Id.* at 23.

At some point after, Officer Lee asked if any of the firefighters or paramedics wanted to press charges. *Id.* at 11. Officer Lee never asked whether this was a medical or criminal event—his primary purpose was to secure the scene and ensure the safety of the medical personnel at the scene. *Id.* at 28-29.

OCPD officers then arrived at the home and secured the scene [Def. City UMF Nos. 24-25]. On December 6, 2019, Canadian County Assistant District Attorney Eric Epplin wrote a letter to OCPD Chief Wade Gourley stating that his office was not going to press

criminal charges against Officer Lee in connection with Mr. Vanlandingham's death. *Id.* at 26.

Officer Lee was hired by the City of Oklahoma City (the City) as a police recruit on August 28, 2015, and received police training from then until March 24, 2016. *Id.* at 1-2. Although state law only requires 600 hours of training, he received 1,455 hours. *Id.* Additionally, Officer Lee received four months of training with Field Training Officers. *Id.* at 3. Oklahoma state law requires full-time police officers attend and complete 25 hours of continuing law enforcement training every year. *Id.* at 4. Officer Lee has attended at least 246 additional hours of in-service training since his graduation from the OCPD Recruit Academy. *Id.* at 5. Upon their induction, police officers are given electronic access to the OCPD Operations Manual and are directed to be familiar with it. *Id.* at 6.

The Chief of Police is the chief administrative officer for the OCPD [Pl.'s AMF 1]. In response to *Tennessee v. Garner*, 471 U.S. 1 (1985), then-Chief of Police Wade Gourley drafted, and the City enacted, OCPD Policy 9.3 on the use of force. *Id.* at 7; *see also* [Pl.'s AMF 4, 5]. OCPD Procedures 150.0-150.18 require an investigation of any use of force beyond routine handcuffing. *Id.* at 9.

The OCPD maintains an Early Intervention Program which reports employees with four or more combined uses of force incidents, formal complaints, and/or administrative investigations per quarter or 10 or more per year [Doc. No. 173, ¶ 11]. The City's policy on use of force and its training has been upheld by judges in this district before [Def. UMF No. 12]. Further, the OCPD has been awarded and accredited by the Commission on Accreditation for Law Enforcement Agencies. *Id.* at 13.

**STANDARD OF DECISION**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for either party. *Id.* at 255. Where the undisputed facts establish that a plaintiff cannot prove an essential element of a cause of action, the defendant is entitled to judgment on that cause of action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

At the summary judgment stage, the court's role is not "to weigh the evidence and determine the truth of the matter," but to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 249-52. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

**DISCUSSION**

**I.     Officer Lee**

In his third amended complaint, Plaintiff asserts four claims under 42 U.S.C. § 1983 against Officer Lee in his individual capacity: (1) unlawful seizure; (2) excessive force; (3) conspiracy to violate/deprive constitutional rights; and (4) failure to intervene. This Court held that Officer Lee was entitled to qualified immunity on Plaintiff's unlawful seizure and failure to intervene claims. Further, Plaintiff was entitled to discovery to find additional

factual support for his remaining two claims against Officer Lee. In the present motion, Officer Lee argues that Plaintiff has not proffered such support and he is entitled to qualified immunity on Plaintiff's excessive force and conspiracy to violate/deprive constitutional rights claims.

"When a defendant raises the defense of qualified immunity, the plaintiff bears the burden to demonstrate that the defendant violated his constitutional rights and that the right was clearly established." *Callahan v. Unified Gov't of Wyandotte Cnty.*, 806 F.3d 1022, 1027 (10th Cir. 2015) (citing *Gross v. Pirtle*, 245 F.3d 1151, 1155-56 (10th Cir. 2001)).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). A court does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Ullery v. Bradley*, 949 F.3d 1282, 1289 (10th Cir. 2020) (citation omitted). "The dispositive question is 'whether the violative nature of the particular conduct is clearly established.'" *Id.* at 1291 (quoting *Mullenix*, 577 U.S. at 12) (emphasis omitted).

### a. Officer Lee is not entitled to qualified immunity on Plaintiff's claim of excessive force.

Officer Lee advances two arguments as to why he is entitled to qualified immunity on Plaintiff's excessive force claim. First, he asserts that he was acting in a medical

emergency capacity rather than a law enforcement capacity, therefore, the Fourth Amendment is not implicated. Further, he argues that even if the Court finds Officer Lee was acting in a law enforcement capacity, the use of force did not violate clearly established law. For the reasons explained below, both arguments fail.

"Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment." *Medina v. Cram*, 252 F.3d 1124, 1131 (10th Cir. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). The relevant factors to be considered in assessing the reasonableness of an officer's use of force are known as the *Graham* factors and include the following: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

Officer Lee's argument regarding the first prong of the qualified immunity analysis is limited to his assertion that he was acting in a medical emergency capacity rather than a law enforcement capacity. Because the Tenth Circuit has not yet distinguished between an officer acting in a medical emergency capacity versus a law enforcement capacity in this situation, Officer Lee points to several out-of-circuit cases to support his position. Further, he attempts to analogize this case to a Tenth Circuit case[1] where officers responded to a

---

[1] *Aldaba v. Pickens*, 844 F.3d 870 (10th Cir. 2016).

call at a hospital requesting help restraining an individual who would die if allowed to leave. For reasons explained below, the Court applies the factors routinely applied by the Tenth Circuit to assess reasonableness in an excessive force claim from *Graham v. Connor*, 490 U.S. 386 (1989).

As a threshold matter, Officer Lee's reliance on *Aldaba* is misplaced. There, officers responded to a call at a hospital requesting help in restraining a patient who would die if allowed to leave. *Id.* at 875. After several failed attempts to calm the patient down, one of the officers fired his taser at the patient. *Id.* at 876. The patient was restrained and medical personnel were able to administer medicine, but he ultimately passed away. *Id.* The Tenth Circuit found the officers were entitled to qualified immunity, holding that the cases relied upon by the plaintiff did not amount to clearly established law. *Id.* at 876-80.

Officer Lee claims that *Aldaba* clearly supports granting him qualified immunity here. But in *Aldaba*, the Tenth Circuit did not rule regarding whether the officers' actions constituted excessive force. Rather, the focus was on the clearly established law prong of the analysis. As Officer Lee notes, the Tenth Circuit has not differentiated between an officer acting in a medical emergency capacity versus a law enforcement capacity for purposes of assessing reasonableness of an officer's use of force under the Fourth Amendment. Accordingly, the Court applies the *Graham* factors to assess the reasonableness of Officer Lee's actions. In applying these factors, the Court distinguishes between the time before Mr. Vanlandingham was handcuffed and after he was handcuffed.

The body-worn camera footage shows that before Mr. Vanlandingham was handcuffed, Officer Lee arrived on the scene and entered the home. The only information

8

he had was that an individual was being combative with the firefighters and paramedics inside. He made his way to the room where firefighters and paramedics were with Mr. Vanlandingham and was immediately asked whether he had any handcuffs. Without answering or waiting for further instructions, he handcuffed Mr. Vanlandingham.

Under these circumstances, the first *Graham* factor—which considers the severity of the crime—is neutral or weighs slightly in favor of Officer Lee. Officer Lee was called to the scene to assist paramedics and firefighters with a combative individual. He was not fully aware of the situation he was walking into but did know some sort of struggle was taking place. In light of the circumstances and Officer Lee's limited information regarding the situation, it was reasonable for Officer Lee to believe that some force would be necessary to restrain the individual at that point.

The second factor looks at the potential threat posed by the suspect to the officer's and others' safety. Upon entering the home, Officer Lee alleges that he witnessed what he thought was a struggle between Mr. Vanlandingham and the firefighters. Again, at this point, some use of force by Officer Lee is reasonable here. He was called to the scene to assist with a "combative" individual, walked into the room and saw a struggle, and handcuffed the individual.

Finally, the third factor looks at the suspect's attempts to resist or evade arrest. Here, upon review of the body-worn camera footage, it does appear there was some sort of struggle on Mr. Vanlandingham's part. From the pleadings and deposition testimony, it appears that the precise events leading up to Officer Lee's entry into the home are disputed. The Court finds that this factor weighs slightly in favor of the use of force. Overall, the

9

Court finds that the *Graham* factors weigh slightly in favor of Officer Lee's use of force when he first entered the home in order to help firefighters restrain Mr. Vanlandingham.

But at the point when Mr. Vanlandingham was restrained and "in custody," and Officer Lee's leg and weight were on top of him, the analysis changes. Once two sets of handcuffs were placed on Mr. Vanlandingham, there were still four firefighters restraining him—one firefighter held down one of his legs while another bent his other leg towards his buttocks—and Officer Lee was kneeling on his back. At this point the last two *Graham* factors weigh against the reasonableness of Officer Lee's use of force. From the body-worn camera footage, a reasonable jury could determine that Mr. Vanlandingham was restrained and no longer a danger to anyone, yet Officer Lee continued to use force. Any attempts made by Mr. Vanlandingham could be found by a jury to merely be attempts to prop himself up on his side after suffering a medical event. The Court finds that the footage is sufficient to create a question of fact for jury determination as to whether the use of force was objectively unreasonable.

Officer Lee next argues that he is entitled to qualified immunity because his restraint of Mr. Vanlandingham did not violate clearly established law. The Court previously denied Officer Lee qualified immunity. *See* [Doc. No. 61]. In doing so, it relied on *Cruz v. City of Laramie*, 239 F.3d 1183, 1188 (10th Cir. 2001) and *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008). For the following reasons, the Court again denies Officer Lee qualified immunity on Plaintiff's excessive force claim.

In *Cruz*, the Tenth Circuit held that it is a constitutional violation for police officers to use a hog-tie restraint against an individual of diminished capacity. *Cruz*, 239 F.3d at

1189-90. There, officers were called to an apartment complex where a man was allegedly running around naked. *Id.* at 1186. The officers could not calm the man down, so they forcibly restrained him and placed him into a hog-tie restraint. *Id.* He ultimately stopped moving and died at the scene. *Id.*

In *Weigel*, the Tenth Circuit held that "the law was clearly established that applying pressure to [a detainee's] upper back, once he was handcuffed and his legs restrained, was constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions." *Weigel*, 544 F.3d at 1155. There, the individual was restrained, handcuffed, and his legs were bound while officers applied pressure to his upper back for three minutes. *Id.* at 1148. He eventually went into cardiac arrest and died. *Id.* at 1149. Defendant attempts to distinguish *Weigel* from the instant case by stating that the trooper in *Weigel* subjected him to force for three minutes that the officers knew was unnecessary, and involved a suspect whose feet and legs were actually bound [Doc. No. 124, at 21].

Recently, the Tenth Circuit upheld a district court's denial of qualified immunity to several officers, including Officer Lee, in a similar case, *Bruner v. Cassidy*, 163 F.4th 1315 (10th Cir. 2026). There, officers responded to a call regarding an individual allegedly trespassing on the property of an Oklahoma City hotel in a nonviolent manner. *Id.* at 1318. Officers restrained the individual and placed him in a prone restraint, but he ultimately died. *Id.* at 1322. The Tenth Circuit held that the district court did not err in its reliance on *Weigel* in determining that the officers acted in violation of clearly established law. *Id.* at 1324-25. The officers argued that *Weigel* could not have clearly established that their

11

conduct was unconstitutional because in *Weigel* the individual's legs were bound while the plaintiff's legs in *Bruner* were not—rather, the individual's legs were bent backwards towards his buttocks. *Id.* at 1322. The Tenth Circuit rejected that argument holding it was clearly established "that the officers' conduct violated [defendant's] constitutional rights, due to the force applied to his upper back and the restraint placed on his legs being similar to a hog-tie, even if his legs were not bound together." *Id.* at 1325.

Similarly here, it is not of importance that Mr. Vanlandingham's legs were not bound in a hog-tie position. What does matter is that his leg was pushed towards his buttocks in a similar position. The Court, following Tenth Circuit precedent in *Bruner*, finds that *Weigel* and *Cruz* are sufficient to show that the law was clearly established at the time of the incident here.

Therefore, Officer Lee is not entitled to qualified immunity on Plaintiff's excessive force claim.

### b.    Officer Lee is not entitled to summary judgment on Plaintiff's conspiracy claim.

"[T]o recover under a § 1983 conspiracy theory, a plaintiff must plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the other will be insufficient." *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990). Further, "a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants." *Frasier v. Evans*, 992 F.3d 1003, 1024 (citation omitted). "The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the

objective or possess the same motives for desiring the intended conspiratorial result." *Id.* at 1024. "[A] defendant's assent [to the conspiracy] can be inferred from acts furthering the conspiracy's purpose." *United States v. Edmondson*, 962 F.2d 1535, 1548 (10th Cir. 1992) (quoting *United States v. Perkins*, 748 F.2d 1519, 1527 (11th Cir. 1984)).

Officer Lee argues here that if the Court grants Plaintiff qualified immunity on the excessive force claim, then it "ineluctably follows" that the law was not clearly established at the time and, therefore, Officer Lee could not have participated in a conspiracy to engage in that action. But even if the Court does not grant Officer Lee qualified immunity on the excessive force claim, as is the case here, he argues he is entitled to qualified immunity on Plaintiff's conspiracy claim because Plaintiff provides no evidence showing any agreement between Officer Lee and any of the medical personnel or firefighters to use excessive force.

Plaintiff alleges that the firefighters, paramedics, and Officer Lee engaged in a conspiracy to restrain Mr. Vanlandingham in a way that violated his constitutional rights. In support, Plaintiff points out that when Officer Lee arrived on scene, one of the individuals asked him if he had handcuffs and without asking any questions, Officer Lee placed the handcuffs on Mr. Vanlandingham. Further, Officer Lee tried to take over the position of one of the firefighters on top of Mr. Vanlandingham. But the firefighter did not move, so Officer Lee decided to join the restraint and added more weight to Mr. Vanlandingham's back. Finally, the body-worn camera footage shows the paramedics, firefighters, and Officer Lee all discussing the continued restraint of Mr. Vanlandingham.

13

Viewing the evidence in the light most favorable to Plaintiff, the Court finds there is minimally sufficient evidence by which a reasonable jury could find a conspiracy existed under § 1983 between Officer Lee, the firefighters, and paramedics.

Accordingly, Officer Lee is not entitled to summary judgment on Plaintiff's conspiracy claim.

## II.     Municipal Liability under 42 U.S.C. § 1983

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citation omitted). As explained above, the Court finds that there is sufficient evidence for a reasonable jury to find that Plaintiff's constitutional rights were violated. Therefore, the first step here is satisfied for municipal liability.

Generally, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978). Rather, where a plaintiff seeks to hold a local governmental entity liable under § 1983, he must also show that a municipal policy or custom "was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997). Specifically, a plaintiff must demonstrate 1) an official policy or custom; 2) causation; and 3) deliberate indifference. *See Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1145 (10th Cir. 2023).

a. **Official Policy or Custom**

An official policy or custom may take many forms, to include "a formal regulation or policy statement, an informal custom that amounts to a widespread practice, decisions of municipal employees with final policymaking authority, ratification by final policymakers of the decisions of subordinates to whom authority was delegated, and the deliberately indifferent failure to adequately train or supervise employees." *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1239-40 (10th Cir. 2020) (quoting *Pyle v. Woods*, 874 F.3d 1257, 1266 (10th Cir. 2017)). Here, Plaintiff bases his argument on failure to train and ratification.

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) (footnote omitted). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Bryan Cnty*, 520 U.S. at 410). "A municipality can be liable where 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 773 (10th Cir. 2013) (quoting *City of Canton*, 489 U.S. at 388).

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*,

15

563 U.S. at 62 (Citing *Bryan Cnty.*, 520 U.S. at 409). "Evidence of a pre-existing pattern of violations is only unnecessary in a narrow range of circumstances . . . in which the unconstitutional consequences of a failure to train are highly predictable and patently obvious." *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1285 (10th Cir. 2019) (citation omitted).

In support of its motion, the City contends that Plaintiff fails to supply evidence suggesting a deficiency in the training of its officers or that it acted with deliberate indifference to a risk that was known or obvious to it at the time. The City proffers evidence of the training of its officers, including training on the use of force. Further, the City educates its officers that the assault of a prisoner in his/her custody is a criminal act and criminal acts are not authorized.

In response, Plaintiff asserts that the OCPD has an official policy that instructs officers on the use of prone restraint with stabilization. But Plaintiff emphasizes that the policy does not instruct the officers on how much force to use or how long to use it, leaving these items to the discretion of the officers. He asserts that the City was aware of the dangers of positional asphyxia and has the power to draft a policy to address this issue, but has failed to do so.

Plaintiff further contends that it has established deliberate indifference here because the OCPD understood the risks associated with using pressure in addition to the prone restraint. Specifically, Plaintiff points to a memorandum that discusses the risk of death when an individual has their hands and feet restrained behind them and they are on their

stomach. Further, Plaintiff points to four in-custody deaths that occurred prior to Mr. Vanlandingham's death.

The Court finds there is evidence from which a reasonable jury could conclude that the need for additional training was so obvious as to support a finding of deliberate indifference. Although Defendant offers extensive evidence regarding its training for officers that has been accredited by a national accrediting organization, Plaintiff provides evidence that the OCPD has known of the dangers of positional asphyxia and has failed to update or change their use of force policy.

In *Cruz v. City of Laramie*, 239 F.3d 1183 (10th Cir. 2001), the Tenth Circuit affirmed a district court's denial of summary judgment. There, the district court held there were genuine issues of material fact regarding deliberate indifference in connection with plaintiff's failure to train claim. *Id.* at 1191. Namely, there was evidence that the city failed to train its officers on the use of hobble restraints and high ranking officials were aware of positional asphyxia attributable to hobble restraints. *Id.* Similarly here, there are genuine issues of material fact as to OCPD's current policy.

The Court does not find Plaintiff's allegations to be "conclusory or generalized failure-to-train allegations." *Huff v. Reeves*, 996 F.3d 1082, 1092 (10th Cir. 2021). Rather, in viewing the summary judgment record in the light most favorable to Plaintiff, the Court finds there is sufficient evidence by which a reasonable jury could find that the need for additional training was so obvious as to support a finding of deliberate indifference.[2]

---

[2] Because the Court finds that Plaintiff's claim survives on its failure to train theory, it need not rule on Plaintiff's ratification theory.

17

### b. Causation

"To establish the causation element, the challenged policy or practice must be 'closely related to the violation of the plaintiff's federally protected right.'" *Schneider*, 717 F.3d at 770 (citation omitted). "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Waller*, 932 F.3d at 1284 (quoting *Brown*, 520 U.S. at 410-12). "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon inadequate training, supervision, and deficiencies in hiring." *Schneider*, 717 F.3d at 770 (10th Cir. 2013).

The City argues that Plaintiff cannot point to any written policy or custom that caused the constitutional injury. It further argues that the written policy of the police department must have caused the employee to violate Plaintiff's constitutional rights, not an alleged violation of procedure by the employee. Plaintiff asserts that the OCPD was aware of the deficiencies in its current policies regarding use of force. Specifically, it points to a 1995 memo from the Department of Justice warning of the dangers of positional asphyxia and to a deposition of Deputy Chief Vashina Butler who testified on the City's policies, procedures, customs, and training in 2019.

The Court finds that a question of fact exists for jury determination as to this matter. Certainly, application of the failure to train theory in this case is closely related to the alleged violation of Mr. Vanlandingham's constitutional rights. Although this element is to

18

be applied with special rigor here, a jury could determine that the City's knowledge of the dangers of positional asphyxia yet lack of additional training, despite continued officer-related deaths, is sufficient to establish causation.

### c. Deliberate Indifference

Deliberate indifference in the municipal liability context "may be satisfied when the [defendant] has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Layton v. Bd. of Cnty. Comm'rs of Okla. Cnty.*, 512 F. App'x 861, 871 (10th Cir. 2013) (unpublished); *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) ("In the municipal liability context, deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the official should have known of it."). While notice is typically established "by proving the existence of a pattern of tortious conduct," deliberate indifference may also be found "absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Barney*, 143 F.3d at 1307-08 (quotation marks and citation omitted).

As analyzed above in Plaintiff's failure to train claim, the Court finds that, in viewing the summary judgment record in the light most favorable to Plaintiff, there is sufficient evidence for a jury to conclude that the City acted with deliberate indifference. Accordingly, the Court finds that the City is not entitled to summary judgment on Plaintiff's claim for municipal liability under 42 U.S.C. § 1983.

19

### III.    Plaintiff's State Law Negligence Claim

Plaintiff asserts a state law claim for negligence against Officer Lee claiming that he was negligent for unreasonably restraining Mr. Vanlandingham, keeping him face down on his stomach for too long, and failing to monitor his airway and breathing. Defendant contends that Officer Lee was acting in a protective capacity rather than investigative, and, therefore, an exemption to the OGTCA applies. Plaintiff failed to respond to Defendant's argument on its state law negligence claim.

The Oklahoma Governmental Tort Claims Act (OGTCA) governs the City's liability. *See* OKLA. STAT. tit. 51, § 151, *et seq.* The City "shall not be liable under the provisions of the [OGTCA] for any act or omission of an employee acting outside the scope of the employee's employment." *Id.* § 153(A). "The OGTCA exempts state and political subdivisions from claims that stem from 'the failure to provide, or the method of providing, police, law enforcement or fire protection.'" *Samuel v. City of Broken Arrow, Okla.*, 506 F. App'x 751, 755-56 (10th Cir. 2012) (quoting OKLA. STAT. tit. 51, § 155(6)). Further, "[t]he Oklahoma Supreme Court has held that 'protection' is the operative word, and that immunity therefore attaches under § 155(6) when police are providing 'protection' as opposed to carrying out a 'law enforcement function.'" *Id.* at 756 (quoting *Salazar v. City of Okla. City*, 1999 OK 20, ¶ 28, 976 P.2d 1056, 1066).

The Tenth Circuit has stated the following regarding when a nonmovant fails to respond to a motion for summary judgment:

> As explained by the Supreme Court in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160-61 (1970), the burden on the nonmovant to respond arises only if the summary judgment motion is properly 'supported' as required by Rule

20

56(c). Accordingly, summary judgment is 'appropriate' under Rule 56(e) only when the moving party has met its initial burden of production under Rule 56(c). If the evidence produced in support of the summary judgment motion does not meet this burden, 'summary judgment must be denied even if no opposing evidentiary matter is presented.' . . . If the nonmoving party fails to respond, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law. If it has not, summary judgment is not appropriate, for '[n]o defense to an insufficient showing is required.'

*Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002) (quoting *Adickes*, 398 U.S. at 160-61).

The Court finds that the City has satisfied its initial burden that "no material issues of fact remain for trial." The City asserts that Officer Lee was acting in a protective capacity because he "was providing [Mr.] Vanlandingham with protective services when [Mr.] Vanlandingham was being attended to by trained medical and fire personnel" [Doc. No. 122, at 21]. On the night of Mr. Vanlandingham's death, Officer Lee was called to a home to assist firefighters with an individual being combative. The body-worn camera footage shows Officer Lee entering the home, placing handcuffs on Mr. Vanlandingham, and placing his weight and shin on Plaintiff's back to restrain him. The Court finds these actions consistent with an officer taking an individual into protective custody.

Further, the Oklahoma Supreme Court explained the applicability of § 155(6) in *Schmidt v. Grady County*, 1997 OK 92, 943 P.2d 595. There, a deputy sheriff placed the plaintiff in the front seat of his patrol car "[w]hile acting within the scope and during the course of his employment as deputy sheriff . . . to protect her from harming herself or others and from being harmed by others." *Id.* ¶ 2, 943 P.2d at 596. The plaintiff either jumped or

21

fell from the vehicle while being transported to the sheriff's department and was injured. *Id.* The court held that the "deputy sheriff was acting as a police officer in relation to the plaintiff [and] . . . was providing police protection to the plaintiff and public" when the plaintiff was injured, and therefore immune from liability. *Id.* ¶ 13, 943 P.2d at 598. In the instant case, Officer Lee restrained Mr. Vanlandingham to protect everyone involved. Accordingly, the Court finds that the City has met its burden by showing that Officer Lee was placing Mr. Vanlandingham into protective custody and no material issues remain for trial on this claim.

Because the Court finds that the City has met its burden pursuant to Rule 56(c), the burden shifts to Plaintiff to respond. But here, Plaintiff wholly fails to respond to the City's motion for summary judgment on Plaintiff's state law claim. Therefore, the City is entitled to summary judgment on Plaintiff's state law claim.

## CONCLUSION

**IT IS THEREFORE ORDERED** that the Motion for Summary Judgment of Defendant Brandon Lee and Brief in Support [Doc. No. 124] is **DENIED**. Defendant City of Oklahoma City's Motion for Summary Judgment and Brief in Support [Doc. No. 122] is **DENIED** in part and **GRANTED** in part as set forth herein.

**IT IS SO ORDERED** this 18th day of March, 2026.

TIMOTHY D. DeGIUSTI
Chief United States District Judge