**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| CHARLES KALEB VANLANDINGHAM, | ) | |
| Administrator for the Estate of | ) | |
| CHARLES LAMAR VANLANDINGHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. CIV-22-209-D |
| v. | ) | |
| | ) | |
| THE CITY OF OKLAHOMA CITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

Before the Court is Plaintiff's Motion to Exclude the Opinions of Dr. Molly Furin and Opening Brief in Support [Doc. No. 136] and Plaintiff's Motion to Strike Dr. Molly Furin as an Expert Witness and Opening Brief in Support [Doc. No. 137]. Defendant American Medical Response Ambulance Service, Inc. filed a combined response [Doc. No. 162], and Plaintiff filed a combined reply [Doc. No. 178]. The matters are fully briefed and at issue. In light of the parties' submissions, including Dr. Furin's expert report [Doc. No. 136-1] and supplemental report [Doc. No. 162-7], the Court finds that a formal hearing is not necessary.

## BACKGROUND

This litigation stems from the death of Charles Lamar Vanlandingham in September of 2019. Plaintiff alleges that Mr. Vanlandingham suffered a medical episode with seizure activity in the early morning hours of September 15, 2019, and Mr. Vanlandingham's girlfriend called 911. According to Plaintiff, Mr. Vanlandingham started to improve in the

1

time it took EMS to arrive. Following the seizure activity, Mr. Vanlandingham had apparently transitioned to a "postictal state" that can cause confusion.

Although Mr. Vanlandingham was initially compliant with EMS upon their arrival, Plaintiff alleges that "EMS providers tried to force Mr. Vanlandingham onto their medical cot," and when Mr. Vanlandingham did not comply, "[EMT] Tuttle ultimately tackled Mr. Vanlandingham onto the medical cot." [Doc. No. 136, at 2]. Plaintiff further alleges that "Mr. Vanlandingham was pinned face down over the side of the cot," and "Mr. Tuttle held Mr. Vanlandingham in this position with his body weight for approximately 5 minutes." *Id.*

Once members of the Oklahoma City Fire Department arrived, Plaintiff claims that the Firefighters removed Mr. Vanlandingham from the cot and wrestled him to the ground into a prone position. Plaintiff alleges that the Firefighters used their body weight to pin Mr. Vanlandingham in the prone position for approximately three minutes before Oklahoma City Police Officer Brandon Lee arrived. Officer Lee then put handcuffs on Mr. Vanlandingham—still in the prone position—and placed his knee across Mr. Vanlandingham's back.

Plaintiff alleges that Mr. Vanlandingham was in this position, handcuffed, for approximately four minutes, during which time "no one checked Mr. Vanlandingham's vitals or advocated for a position change despite Mr. Vanlandingham's clear signs of respiratory distress." *Id.* at 3. "Without knowing Mr. Vanlandingham's vitals and without performing any kind of medical assessment," EMT Tuttle then administered midazolam (a

sedative), and Mr. Vanlandingham went limp. *Id.* CPR efforts were unsuccessful, and Mr. Vanlandingham died at the scene.

Plaintiff's claims are against Defendants City of Oklahoma City, Officer Brandon Lee, and American Medical Response Ambulance Service, Inc. (AMRAS). During discovery, AMRAS disclosed an expert report prepared by Molly A. Furin, M.D., M.S., who is board certified in both Emergency Medicine and Emergency Medical Services. [Doc. No. 136-1, at 1].

In the present motion, Plaintiff contends that Dr. Furin's offered opinions should be excluded under FED. R. EVID. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Specifically, Plaintiff contends that Dr. Furin has failed to provide a basis for any of her proposed expert opinions, as required by this standard.

## LEGAL STANDARD

Rule 702 codifies the Supreme Court's decision in *Daubert* regarding the admissibility of expert opinion testimony and defines the trial court's gatekeeping role. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

3

FED. R. EVID. 702.

In considering whether an expert opinion is admissible, the Court performs a two-step analysis. First, the Court determines whether the expert is qualified by "'knowledge, skill, experience, training or education' to render an opinion." *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006) (quoting FED. R. EVID. 702). If so qualified, the Court must then determine whether the expert's opinion is reliable under the principles set forth in *Daubert*, and relevant in that it will assist the trier of fact. *103 Investors I, L.P.*, 470 F.3d at 990; *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).

When the testimony of an expert is challenged, the proponent of the testimony bears the burden of establishing its admissibility. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc). Where expert testimony is found to be both relevant and reliable, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## DISCUSSION

### I.      Timeliness of Dr. Furin's Supplement

Dr. Furin supplemented her expert report on May 20, 2025 [Doc. No. 162-7]. In it, Dr. Furin does not expand the opinions listed in her initial report, but she does provide supplemental explanation of her education and experience in the emergency medicine field. Plaintiff contends that Dr. Furin's supplement is untimely under FED. R. CIV. P. 26(e)(2).

4

Rule 26(e)(2) imposes a duty on expert witnesses to supplement their opinions, extending "both to information included in the [expert] report and to information given during the expert's deposition." FED. R. CIV. P. 26(e)(2). "Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." *Id.* The disclosures referenced in Rule 26(a)(3) include witness lists, deposition designations, and exhibit lists. FED. R. CIV. P. 26(a)(3)(A)(i)-(iii). These disclosures are to be made "at least 30 days before trial," unless the Court orders otherwise. FED. R. CIV. P. 26(a)(3)(B).

Here, the parties' deadline for final witness and exhibit lists expired before Dr. Furin issued her supplemental report. However, Rule 26(a)(3) also refers to the deadline to file deposition designations, which has yet to expire. Accordingly, the Court finds that Dr. Furin's supplement of May 20, 2025, is timely under Rule 26(e)(2). *See Northstar Mgmt., Inc. v. Vorel*, No. CIV-19-260-SLP, Doc. No. 209, at *5-6 (W.D. Okla. Nov. 15, 2022) (deeming expert supplementation timely when it occurred after deadline to submit final witness and exhibit lists, but before the deadline for the remaining pretrial submissions, to include deposition designations and the parties' final pretrial report).

## II.    *Daubert* Motion

Dr. Furin's report includes an introduction, summarizing her experience in emergency medicine; a section on "records reviewed"; a summary of events; and a bullet-point list of Dr. Furin's opinions. In four bullet points, Dr. Furin lists the following opinions:

- Paramedic Tuttle and EMT Barnes performed an appropriate rapid assessment of Mr. Vanlandingham upon arrival, including checking blood glucose, and could not proceed with further evaluation and treatment because it became unsafe to do so. Evaluating for scene safety is one of the first skills taught in Emergency Medical Services, and the crew appropriately called for additional resources in a timely manner. Physical restraint of Mr. Vanlandingham was necessary at the time in order to prevent harm or injury to himself or crew members.

- Upon the arrival of OCFD personnel, including Paramedic Morton, care was correctly transitioned to Paramedic Morton.

- Paramedic Tuttle assisted the OCFD by drawing up and administering midazolam IM as requested. Sedation was paramount in order to further evaluate and treat Mr. Vanlandingham. Midazolam is a benzodiazepine, utilized for both sedation and treatment of seizures, and when administered intramuscularly takes a minimum of several minutes to take effect. Given the very brief time interval after administration, the midazolam had no causative role in Mr. Vanlandingham's subsequent cardiac arrest.

- When Mr. Vanlandingham sustained cardiac arrest, he was efficiently treated with high quality [Advanced Cardiovascular Life Support] care.

[Doc. No. 136-1, at 3].

Notwithstanding Dr. Furin's experience in the emergency medicine field, her stated opinions largely consist of conclusory statements, with no basis provided for any stated opinion. As Plaintiff does not contest Dr. Furin's qualifications, the issue is whether Dr. Furin's opinions—as set out in her expert report—have a reliable basis in the knowledge and experience of her field. As one judge in this district explained:

> It is fundamental that, if the basis for an expert's opinions is to be tested for reliability, that basis must be identified in some fashion. What is the industry standard that underlies the opinion? What is the scientific principle which explains a particular phenomena? What is the custom or practice which, applied to the facts of the case, leads to the particular opinion of the expert? What is the aspect of the expert's experience or training that allows him or her to reach a particular conclusion?

6

> Absent some identification of the basis for the expert opinion, there is little or no way to test it against any of the guidelines or factors involved in a *Daubert* analysis or to otherwise determine its reliability.

*Threet v. Corr. Health Care Mgmt. of Oklahoma, Inc.*, No. CIV-07-943-HE, 2009 WL 3335596, at *5 (W.D. Okla. Oct. 15, 2009). Or, put more succinctly, it does not suffice "for an expert to say, in effect, 'trust me, I know.'" *Id.* at *4; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) ("[W]itnesses 'relying solely or primarily on experience … must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'") (quoting FED. R. EVID. 702 advisory committee's note (2000 Amendment)).

First, the Court finds that Dr. Furin's initial report fails to clearly identify the basis for her opinions or explain how certain standards or her experience lead to the conclusions reached. Dr. Furin does not identify how her experience in the emergency medicine field led to her specific opinions, leaving Plaintiff with "little or no way to test [Dr. Furin's conclusions] against any of the guidelines or factors involved in a *Daubert* analysis or to otherwise determine [their] reliability." *Threet*, 2009 WL 3335596, at *5.

Next, Dr. Furin's supplemental expert report [Doc. No. 162-7] does little to expand on the basis for her four opinions. Rather, Dr. Furin focuses on her qualifications to issue opinions regarding emergency medicine. For example, to supplement her opinion that EMS

7

"could not proceed with further evaluation [of Mr. Vanlandingham] because it became unsafe to do so," Dr. Furin provides that she took medical school courses on patient interaction and patient assessments, she is board certified in Emergency Medicine and Emergency Medical Services, she is licensed to practice medicine in four states, she currently works in an Emergency Department, she teaches and trains medical providers at all levels, she instructs EMT courses and implemented EMS Continuous Quality Improvement programs for EMS services, and she has authored an article on unsafe scenes, among other qualifications. *Id.* at 2-3. Dr. Furin further states that she "reviewed the patient care reports, interviews, and documents provided to [her] in this case and [is] certainly qualified to offer opinions as to the appropriateness of patient assessment and treatment." *Id.*

Dr. Furin's qualifications in emergency medicine are not challenged. But Dr. Furin has largely failed—even after supplementing her report—to provide a basis for her opinions. Dr. Furin's experience in emergency medicine, standing alone, is not sufficient to support her opinion that EMS "could not proceed with further evaluation because it became unsafe to do so." [Doc. No. 162-7, at 2]. Dr. Furin also opined that "[u]pon the arrival of OCFD personnel, including Paramedic Morton, care was correctly transitioned to Paramedic Morton." *Id.* at 3. However, in Dr. Furin's supplement, she explains that she is "qualified to offer opinions as to appropriateness" because "transitions of care are part of [her] routine practice." *Id.* Dr. Furin also lists some examples of care transitions between providers and notes that, in this case, "care was transitioned between two providers with the same level of certification and scope of practice." *Id.* Again, apart from explaining her

experience in emergency medicine and providing examples of transitions of care, Dr. Furin's supplemental report does not sufficiently explain how her experience (or knowledge of the industry standard) led her to opine that the transition of care in this case was "correct."

Next, Dr. Furin's supplement does not provide a basis for her opinion that "[s]edation was paramount in order to further evaluate and treat Mr. Vanlandingham." *Id.* at 3. To supplement the basis of this opinion, Dr. Furin explains that midazolam (the sedative used) is used very frequently in the Emergency Department and pre-hospital setting to "provide anxiolysis and sedation," that Dr. Furin "regularly order[s] and observe[s] the administration of midazolam," and that she "provide[s] on-line medical direction for EMS providers and [is] often consulted regarding sedation and the administration of intramuscular medications." *Id.* at 4. Again, although Dr. Furin is likely *qualified* to give opinions related to the administration of sedatives in the emergency setting, Dr. Furin's initial report and supplement do not provide any reasoning or basis for her opinion that the administration of midazolam was appropriate or necessary in Mr. Vanlandingham's case. The same is true for Dr. Furin's opinion that "[w]hen Mr. Vanlandingham sustained cardiac arrest, he was efficiently treated with high quality ACLS care." *Id.* Although Dr. Furin states that she "reviewed the patient care reports and documents provided to me, and [is] qualified to opine as to the quality of care provided when Mr. Vanlandingham sustained cardiac arrest," Dr. Furin fails to provide any basis or reasoning for her opinion that the care provided to Mr. Vanlandingham was efficient and high quality. *Id.*

9

A portion of Dr. Furin's third opinion is admissible under Rule 702 and *Daubert* because Dr. Furin has provided a sufficient basis for it. Specifically, to support her opinion that "[g]iven the very brief time interval after administration [of the midazolam], the midazolam had no causative role in Mr. Vanlandingham's subsequent cardiac arrest," Dr. Furin explains that she "regularly order[s] and observe[s] the administration of midazolam and [is] very familiar with the time to onset." [Doc. No. 162-7, at 4]. In her report, she also supplies the basis for her opinion that midazolam did not contribute to Mr. Vanlandingham's cardiac arrest by explaining that when midazolam is administrated intramuscularly, as in this case, it "takes a minimum of several minutes to take effect." *Id.* Dr. Furin can opine that—given her firsthand knowledge and experience with the administration and onset of midazolam—the midazolam could not have taken effect before Mr. Vanlandingham's cardiac arrest.

For the reasons stated herein, Plaintiff's Motion to Exclude the Opinions of Dr. Molly Furin and Opening Brief in Support [Doc. No. 136] is **GRANTED in part** and **DENIED in part**. Dr. Furin may testify as to her opinions regarding the administration of midazolam and its impact on Mr. Vanlandingham's cardiac arrest, given the onset time of midazolam when administered intramuscularly. As to the remainder of the opinions contained in Dr. Furin's expert report, Defendant AMRAS has not met its burden to demonstrate that these opinions are reliable, and they are therefore excluded.

For the same reasons, Plaintiff's Motion to Strike Dr. Molly Furin as an Expert Witness and Opening Brief in Support [Doc. No. 137], which mirrors the arguments of Plaintiff's *Daubert* motion, is **DENIED** as **MOOT**.

10

**IT IS SO ORDERED** this 18th day of March, 2026.

_____
TIMOTHY D. DeGIUSTI
Chief United States District Judge